### MILLER v. UNITED STATES.

#### MUNROE v. SAME.

(Circuit Court of Appeals, Seventh Circuit. June 23, 1909. Petition for Rehearing Overruled October 13, 1909.)

#### Nos. 1,542, 1,543.

1. POST OFFICE (§ 35*)—OFFENSES AGAINST POSTAL LAWS—USE OF MAILS TO DEFRAUD.

To constitute the offense of using the mails to defraud, under Rev. St. § 5480 (U. S. Comp. St. 1901, p. 3696), there must have been an intention to injure the person addressed or sought to be reached by defrauding him of something which he already had; and the making of false representations, for the purpose of deceiving the persons addressed by raising expectations of gain or advantage which it was not the intention to fulfill, is insufficient.

[Ed. Note.—For other cases, see Post Office, Cent. Dig. § 55; Dec. Dig. § 35.*]

2. POST OFFICE (§ 35*)—OFFENSES AGAINST POSTAL LAWS—USE OF MAILS TO DEFRAUD.

Defendants were officers of a manufacturing corporation, owning a plant and actually engaged in manufacturing and selling the product. In order to sell an increased issue of stock, defendants sent through the mails letters to certain persons, representing that the company desired to establish branch selling houses and to employ managers therefor at a stated salary. The letters also contained false representations as to the profits and dividends of the company, and by their means certain of the persons addressed were induced to purchase stock of the company at par in the belief that they would be appointed branch managers. *Held,* that an indictment charging such facts, and that the representations made were knowingly false, did not charge the offense of using the mails to defraud, within the meaning of Rev. St. § 5480 (U. S. Comp. St. 1901, p. 3696); it not being charged that the stock was not worth the price paid for it.

[Ed. Note.—For other cases, see Post Office, Cent. Dig. § 55; Dec. Dig. § 35.*]

In Error to the District Court of the United States for Eastern Division of the Northern District of Illinois.

The facts are stated in the opinion.

Thomas C. Miller and Frank L. Munroe were each convicted of a criminal offense, and each bring error. Reversed.

---

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes

William S. Forrest, for plaintiff in error Miller.
Henry Russell Platt, for plaintiff in error Munroe.
Edwin W. Sims and Francis G. Hanchett, for the United States.

Before GROSSCUP, BAKER, and KOHLSAAT, Circuit Judges.

GROSSCUP, Circuit Judge, delivered the opinion.

The writ of error is to a judgment of the Court below sentencing the plaintiff in error Miller to imprisonment in the house of correction of the City of Chicago for the period of three years, and to pay the costs of suit; and the plaintiff in error Munroe to imprisonment in the United States penitentiary at Fort Leavenworth for the period of three years, and to pay the costs of suit—the judgment in each case being upon a verdict of guilty upon three counts of an indictment under section 5480 of the Revised Statutes (U. S. Comp. St. 1901, p. 3696). Each count of the indictment sets forth substantially the same scheme to defraud. Each is, however, for a separate offense; the first based upon a letter placed in the postoffice at Chicago, and addressed to one Mattson, at Philadephia; the second upon a letter placed in the postoffice at Chicago and addressed to one Foster, at Mason, Michigan; and the third upon a letter placed in the postoffice at Chicago, addressed to one Thompson, at Lake City, Florida. The verdict was a general verdict of guilty upon the three counts and, therefore, for the three offenses; and the judgment and sentence was judgment and sentence upon such general verdict.

The assignments of error cover 147 closely printed pages of the record. They challenge the sufficiency of the indictment; the correctness of the ruling of the Court in refusing, at the close of all the evidence, to direct the jury to find plaintiffs in error not guilty; the inclusion of evidence offered by the Government over the objection of plaintiffs in error; the exclusion of evidence offered by plaintiffs in error upon the objection of the Government; the charge to the jury; and the refusal of the Court to submit certain instructions asked for by plaintiffs in error—the details of which are set forth in ninety-one different assignments. There is no occasion, however, as will be seen when the reading of this opinion is completed, to deal with these assignments in detail.

The controlling principle that seems to have governed the prosecution of the case in the Court below, and the rulings of that Court in overruling the demurrer to the indictment, and that runs through the whole trial, especially in the charge to the jury, was this: That apart from any intention upon the part of plaintiffs in error actually to deprive the persons named of the money, or other thing of value that such persons might be induced to give up, there would be an offense under section 5480, provided there were put forth, as a part of the alleged scheme, false and fraudulent pretenses, known at the time to be false and fraudulent, which were intended to deceive the persons to whom they were made, even though such pretenses would result in depriving such persons of nothing that they contributed, apart from the mere expectations excited. In other words, it is contended by the Government, and the contention is supported throughout in the rulings

at the trial, that although the scheme alleged in the first two counts was not one through which any one would suffer any actual money loss or injury—be any the worse off, except in the matter of disappointed expectations, after than before—an offense under the Section is nevertheless committed, provided the pretenses embodied in the scheme, and the expectations excited thereby, were in fact false pretenses and a false expectation, known by the party making them to be false at the time made. And because of the application of this view of the Section of the statute in question, there runs throughout the whole record errors that make the trial, in all its branches, erroneous.

The alleged scheme grew out of the following transactions: In January, 1905, the Marinette Gas Engine Company, whose plant and business office were at Chicago Heights, Illinois, and whose president was plaintiff in error Miller, increased its capital stock from $250,000 to $400,000, divided into four thousand shares of the par value of $100 each. The Marinette Gas Engine Company was an actual manufacturer of gas engines, employing from 100 to 150 men, and having a pay roll of about $7,000 per month, engaged in the actual selling of such engines to the public, many of which are in use in the United States, Japan, Portugal and Mexico, and had a plant and good will variously estimated at being worth from $65,000 upwards to the full par value of the Company's capitalization. The facts clearly disclose that the Company, at the time of the initiation of the alleged scheme, was not a fictitious company, but a real manufacturing company, in need, however, of additional capital.

The alleged scheme set forth in the indictment grows out of the method used to obtain this additional capital. In each of the counts, the scheme as set forth is substantially the same. In each, the particulars are the alleged false representations that the Company was desirous of opening and establishing, in good faith, in different parts of the United States, branch houses for the sale of the goods of their manufacture, and were desirous of obtaining in good faith the services of competent, trustworthy and responsible men to manage such branch houses; that the corporation would pay such managers fixed salaries of $250 per month, besides profits extra; that the Company was earning a profit of twenty per cent. and upwards on its business, and paying dividends of six per cent. to holders of its stock out of its net earnings; that the purpose of such alleged false representations was to sell and dispose at par of fifty shares of the increased capital stock to each of the persons addressed; that the plaintiffs in error were not desirous of obtaining in good faith the services of the persons responding and were not expecting in good faith to pay $250 per month, besides profits extra; that the Company was not earning a profit of twenty per cent. or any other profit, or paying a dividend of six per cent. or any other dividend; indeed, that all these pretenses were falsely put forth simply to induce the persons responding to purchase each, fifty shares of stock at par; that such persons were induced to come from their respective homes to Chicago, to talk over the arrangements with a view to entering into a contract, and were induced, finally, to enter into a contract, whereby, in exchange for fifty shares of stock, each paid par value, Five Thousand Dollars, for the same—the

plaintiffs in error never intending that there should be any relationship between them and the persons responding other than that created by the sale and purchase of the stock. There is, however, in the first two counts, no averment whatever respecting the value of such stock so exchanged for the Five Thousand Dollars—the third count alone averring "that said fifty shares of the capital stock of said corporation was not at the time of the devising of said scheme and artifice, and would not be at the time of executing the same, worth Twenty-five Hundred Dollars," as the plaintiffs in error well knew.

The mere intention of the plaintiffs in error not to meet the expectations of the persons responding to the letters, in the matter of their employment as branch house managers, and of their salary and profits in consequence thereof, and of the earnings of the Company and the dividends therefrom, do not, in the absence of intended loss or injury to such persons in the investment made, constitute, in our opinion, a crime under section 5480.

In support of its contention that the false expectations excited, apart from any actual loss intended, constitute a crime under this Section, the Government cites us Durland v. United States, 161 U. S. 306, 16 Sup. Ct. 508, 40 L. Ed. 709; Brooks v. United States, 146 Fed. 223, 76 C. C. A. 581; Horman v. United States, 116 Fed. 350, 53 C. C. A. 570; Weeber v. United States (C. C.) 62 Fed. 740; O'Hara v. United States, 129 Fed. 551, 64 C. C. A. 81; Miller v. United States, 133 Fed. 337, 66 C. C. A. 399; and United States v. Loring (D. C.) 91 Fed. 881.

But none of these cases sustains the contention. The Durland Case was that of a fictitious bond and investment company and was based upon the averment in the indictment and the proof in the case that the persons buying such bonds, through the expectation of profits, would be actually deprived of the sum of money contributed.

The Brooks Case was that of a bogus broker, pretending to deal in grain, provisions and stock, with such superior knowledge concerning the business as to make loss improbable, promising large profits, and in the meantime paying interest to depositors at the rate of six per cent. per month and permitting withdrawals at the depositor's election —glowing promises held out—but the indictment averred and the proof showed that the person accused had no such knowledge and no such connection, and did not intend, for any great length of time, to pay the interest or permit withdrawals, but intended to obtain the money for the sole purpose of converting it to his own use.

The O'Hara Case was like the Brooks Case, except that the superior experience of the schemer was said to be in the racehorse line, rather than in the stock, grain and provision line—but intending to result, as in the Brooks Case, in the party indicted obtaining for his own use, the person's money to whom the letter was addressed.

So likewise, the Loring Case.

The Horman Case was based upon a scheme to extort money from another by threatening to publish charges against him, the intention being to thereby convert such person's money to the accused's use.

The Miller Case is stated by Judge Sanborn as follows:

"The indictment contains averments that the scheme of the defendant was to have Gilder secure the possession and control of the funds and business of the corporation (a so-called mutual insurance company) by means of 'a certain agreement or arrangement' between him and the Board of Directors, and that this scheme was to get from the corporation and from its members, and to secure to the defendants, large sums of money, to bankrupt the corporation, and to use the postoffice establishment of the United States as a part of this scheme to accomplish its object."

It will thus be seen that in all these cases there is present, as an essential element of the scheme, the intention to defraud the persons addressed, not out of expectations excited (the expectations were the means used only) but out of the money, or a portion thereof, contributed by them to the scheme. In none of these cases is the mere false pretense or misrepresentation, apart from an actual intended deprivation of the person addressed of the money obtained, held to be an offense under the section in question. In other words, in all these cases the gist of the offense is the actual or intended injury to the person sought to be reached—the fraudulently depriving him of something that he already has—in none of them is the deprivation of the person addressed of only that which he was led to expect, made the basis of the prosecution.

Suppose that Mattson and Foster, the persons named in the first two counts, did not get employment, would they be defrauded, provided they got their outlay back? Defrauded of what—of the expected employment? Apart from what was falsely held out to them, they had no claim on such employment. Defrauded of an investment that would pay twenty per cent.? Apart from what was falsely held out, they had no claim to such an investment. How can they be said to be deprived of anything that has no existence, except in the false promise itself; and if there was no intention to deprive, there cannot, within the meaning of this Section, be an intention to defraud; for to be defrauded, the person must be deprived by deceit or artifice of something that he has the right to hold or claim, not in virtue of the deceit or artifice, but as against such deceit and artifice.

True, there is some testimony in the record, such as the sale of the stock of the Marinette Company to persons on the inside at forty cents, at about the time this scheme was devised, and some alleged declarations of Miller, that tend to show that one of the purposes of the scheme was to sell to the persons addressed, at par, stock in the Company that the promoters of the scheme knew to be worth much less than par—testimony that was pertinent to the third count of the indictment; but the conviction and sentence, as already stated, was a general one on all three counts, including the first and second as well as the third—counts that aver no such intended injury, or anything upon which such intended injury can be based—and the rulings were all on the theory that it was not the loss or injury in the investment, but the disappointment of expectation excited by the promises that constituted the offense; from which it follows that the judgment must be reversed.

We have gone through the assignments of error to ascertain if, on any of the specific questions raised during the course of the trial, there should, in the view of another trial, be any more specific answer

than what has already been stated; but we find nothing in the record that, once the trial of this case is set on its right course—is tried upon a correct theory—will not be fully answered by the ordinary and fundamental rules of pleading, evidence, and instructions by the Court to the jury. There seems to be no need, therefore, to repeat these rules here.

The judgment is reversed, with instructions to grant a new trial and to proceed further, in accordance with this opinion.