LINN v. UNITED STATES.

(Circuit Court of Appeals, Seventh Circuit. January 4, 1916. Rehearing Denied May 25, 1916.)

No. 2081.

1. POST OFFICE ⬤⟿35—OFFENSES—ESSENTIALS.

To constitute the offense denounced by Criminal Code (Act March 4, 1909, c. 321) § 215, 35 Stat. 1130 (Comp. St. 1913, § 10385), declaring that whoever shall use the mails in connection with any scheme to defraud shall be guilty of an offense, it is not essential that the scheme meet with success, or result in gain to the perpetrator or loss to another.

[Ed. Note.—For other cases, see Post Office, Cent. Dig. § 55; Dec. Dig. ⬤⟿35.]

2. INDICTMENT AND INFORMATION ⬤⟿71—SUFFICIENCY OF INFORMATION.

A count of an indictment, which advised defendant with reasonable certainty of the nature of the accusation he had to meet, is sufficient.

[Ed. Note.—For other cases, see Indictment and Information, Cent. Dig. §§ 144, 174, 193, 194; Dec. Dig. ⬤⟿71.]

3. INDICTMENT AND INFORMATION ⬤⟿99—COUNTS—SUFFICIENCY.

In a prosecution under Criminal Code, § 215, for using the mails in connection with a scheme to defraud, subsequent counts in an indictment may refer to a previous count for the scheme.

[Ed. Note.—For other cases, see Indictment and Information, Cent. Dig. §§ 270, 270½; Dec. Dig. ⬤⟿99.]

4. CRIMINAL LAW ⬤⟿371(1)—EVIDENCE—OTHER OFFENSES—USING MAILS TO DEFRAUD.

In a prosecution under Criminal Code, § 215, for using the mails in connection with a scheme to defraud by selling worthless mining stock, evidence of the mailing of letters other than those contained in the indictment in connection with the scheme is admissible to establish accused's intent.

[Ed. Note.—For other cases, see Criminal Law, Cent. Dig. §§ 830, 831; Dec. Dig. ⬤⟿371(1).]

5. CRIMINAL LAW ⬤⟿394—EVIDENCE—UNLAWFUL SEIZURES—WHAT CONSTITUTES.

In a prosecution for using the mails in connection with a scheme to defraud, where accused consented that a witness might have certain letters, he cannot complain of the admission of such letters on the ground that they were seized in violation of the constitutional inhibitions against unreasonable searches and seizures.

[Ed. Note.—For other cases, see Criminal Law, Cent. Dig. §§ 875, 876; Dec. Dig. ⬤⟿394.]

6. POST OFFICE ⬤⟿50—OFFENSES—JURY QUESTION.

In a prosecution for using the mails in connection with a scheme to defraud, the question whether accused mailed certain letters in connection with his project to dispose of worthless mining stock held for the jury.

[Ed. Note.—For other cases, see Post Office, Cent. Dig. §§ 87–89; Dec. Dig. ⬤⟿50.]

⬤⟿For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

7. POST OFFICE ⬤⇒49—OFFENSES—EVIDENCE—ADMISSIBILITY.

Accused secured a contract for the purchase of a mine, organized a corporation, and sold stock, though he knew of the existence of a mortgage, its foreclosure, and that his vendor could not give possession. *Held* that, in a prosecution for using the mails in disposing of the worthless stock, evidence of a transcript of the record of the foreclosure of the mortgage on the mine was not error.

[Ed. Note.—For other cases, see Post Office, Cent. Dig. §§ 84–86; Dec. Dig. ⬤⇒49.]

8. POST OFFICE ⬤⇒49—OFFENSES—EVIDENCE—ADMISSIBILITY.

In a prosecution under Criminal Code, § 215, for using the mails in connection with a scheme to defraud by disposing of worthless mining stock, evidence *held* to warrant conviction.

[Ed. Note.—For other cases, see Post Office, Cent. Dig. §§ 84–86; Dec. Dig. ⬤⇒49.]

In Error to the District Court of the United States for the Eastern Division of the Northern District of Illinois.

Robert Linn was convicted of violating Criminal Code, § 215, by using the mails in connection with a scheme to defraud, and he brings error. Affirmed.

The indictment under which plaintiff in error was convicted has three counts.

The first charges him with devising a scheme or artifice to defraud Bailey, Reynolds, and Brockius, and a large class of other persons desirous of purchasing shares of stock in gold mines; that Linn was president and fiscal agent of the New Comstock Gold Mining Company, an Arizona corporation, with $10,000,000 capital stock, and that he exercised control and direction of the sale of the corporation's stock and of the money derived therefrom; that the scheme and artifice to defraud was to enter into correspondence through the post office establishment with the various persons to be defrauded, to induce them to buy shares of stock in said corporation at prices ranging from 10 to 25 cents per share, and to defraud them out of whatever purchase price they so paid for such shares.

It is charged that in order to induce such persons to purchase such shares of stock, Linn was falsely to represent to such persons so intended to be defrauded that said corporation owned certain mining property in the state of Nevada, and that the title to such property was perfect; that a man had offered said corporation $5,000,000 for said property; that Linn thought the stock which he was offering at various prices ranging from 15 cents to 20 cents per share would be worth $5 per share within two years; that the assets of the corporation consisted of building, mining tools and equipment, and electrical machinery, and that only a little of the stock was being offered at such low prices in order to make the necessary improvements in the mine; that the company was equipping its mines with electrical machinery, and that in the mines there was approximately $25,000,000 of gold ore; whereas the indictment charges that each and all of such representations were then untrue, false, and fraudulent, and were known so to be by Linn, and it is charged that in attempting to execute such scheme and artifice to defraud, so devised or intended to be devised, Linn placed in the post office at Chicago, for sending through the mail, a letter, dated March 4, 1910, addressed to Bailey, which letter sets forth the count sets forth.

The second count charges that, for the purpose of executing the same scheme and artifice to defraud as is set forth in the first count, Linn mailed at Chicago a letter to Reynolds, as in the second count set forth. And the third count charges that pursuant to the same scheme and artifice to defraud, and to execute same, Linn deposited in the mail at Chicago a letter, set forth in said third count, to Brockius.

⬤⇒For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

In the second and third counts the reference to the scheme or artifice to defraud, as set forth in the first count, is in the following language: "So having devised the said scheme and artifice to defraud described and set forth in the first count of this indictment, as in that count described and set forth, for the purpose of executing the same, and for the purpose of defrauding by and through that scheme and artifice," etc. It is not charged in the indictment that in and by the scheme any one of the persons referred to sustained any loss, or that Linn realized any profit.

The indictment was found under section 215 of the Criminal Code, which is directed against use of the mails to promote frauds. Demurrer interposed to the indictment was overruled. At the conclusion of the government's case, and again after all the evidence, peremptory motions were made on behalf of Linn to instruct the jury to find him not guilty. These were denied. The jury found him guilty, motion for new trial and in arrest of judgment were overruled, and judgment given on verdict, sentencing Linn to six months' imprisonment in the House of Correction and to pay a fine of $250. Further facts are stated in the opinion.

Fred B. Silsbee, of Chicago, Ill., for plaintiff in error.

H. R. Harris, Jr., of Chicago, Ill., for the United States.

Before BAKER, KOHLSAAT, and ALSCHULER, Circuit Judges.

ALSCHULER, Circuit Judge (after stating the facts as above). [1] On behalf of plaintiff in error, Linn, it is contended that his demurrer to the indictment should have been sustained as to the first count because it is not therein alleged that any of the stock was in fact sold, nor that by and through the fraud and artifice charged any one actually paid anything to Linn, nor that any one was in fact defrauded, nor that Linn thereby realized any profit.

In order to constitute the offense defined by section 215 it is not essential that the alleged fraudulent scheme or artifice met with success, or that gain or advantage accrued to the perpetrator, or loss to another. The offense is committed if, in the execution or furtherance of any such scheme or artifice to defraud, the post office establishment of the United States is employed as defined in said section 215. Grey v. United States, 172 Fed. 101, 96 C. C. A. 415; Stockton v. United States, 205 Fed. 462, 123 C. C. A. 530, 46 L. R. A. (N. S.) 936; United States v. Young, 232 U. S. 155, 34 Sup. Ct. 303, 58 L. Ed. 548; Weeber v. United States (C. C.) 62 Fed. 740.

[2] Without commenting on the contention that the count fails to specify various other essentials of a valid indictment under section 215, we will say that the count advised the defendant with reasonable certainty of the nature of the accusation he had to meet, and this being sufficient, the count is good.

[3] It was insisted, particularly on oral argument, that as to the second and third counts the demurrer should have been sustained because the alleged scheme to defraud is not set forth in these counts. It is well settled that it is not necessary in each count of an indictment to restate the scheme or artifice to defraud, which has been duly set forth in another count, but that apt reference in the counts (such as is here found in counts 2 and 3) to the scheme as it is so set forth in another count, is sufficient and proper. Foster v. United States, 178

Fed. 165, 101 C. C. A. 485; Crain v. United States, 162 U. S. 625, 16 Sup. Ct. 952, 40 L. Ed. 1097; Blitz v. United States, 153 U. S. 308, 14 Sup. Ct. 924, 38 L. Ed. 725.

The case of United States v. Hess, 124 U. S. 483, 8 Sup. Ct. 571, 31 L. Ed. 516, which is relied on as holding contrary, is not in point. There, in an indictment for using the mails to defraud, the count merely stated that the defendant, having devised a scheme to defraud, did in the execution of the scheme receive through the Post Office a certain letter which is as set forth in the indictment. There was no further statement of the fraudulent scheme, and no reference to any other count of the indictment which did set it forth, if indeed there was any such count. The count was very properly held bad for failure to state what was the fraudulent scheme.

We find no error in overruling the demurrer to the indictment.

[4] On the trial a number of letters purporting to have been written by Linn, other than the letters set forth in the indictment, were offered in evidence on behalf of the government, and, against objection, were admitted. It is claimed that because these letters were not set forth or referred to in the indictment they were not competent evidence, and that the admission of them was error. That such letters are admissible in evidence as bearing upon the intent or state of mind of the defendant with reference to the alleged fraudulent scheme is well established by the decisions. Packer v. United States, 106 Fed. 906, 46 C. C. A. 35; Dillard v. United States, 141 Fed. 303, 72 C. C. A. 451; Rumble v. United States, 143 Fed. 772, 75 C. C. A. 30; Walsh v. United States, 174 Fed. 615, 98 C. C. A. 461.

Without here setting forth or analyzing the letters so admitted, it seems clear to us that upon the question of Linn's intent and of his state of mind with reference to the alleged fraudulent scheme, they had a decided bearing, and were competent as evidence thereon.

[5] It is also urged against the admissibility of some of these letters that they were taken from plaintiff in error by a federal post office inspector without Linn's consent, and in violation of his right of protection against unlawful search and seizure. It appears from the uncontradicted testimony of witness Clarahan that he showed these letters to Linn and asked him if he (Clarahan) might have them, and that Linn said he might. Under these circumstances no question of improper search and seizure can be said to arise.

[6] It is also contended that the record does not show the indictment letters to have been deposited in the post office or sent through the mail. Clarahan testified that Linn told him that he had mailed these letters in Chicago. Linn did not deny saying this to Clarahan, but in his testimony said that he told Clarahan that he supposed he had sent them through the mail, although he testified that if he so stated he must have been mistaken, since these particular letters were delivered by him in person to those to whom they appear to be addressed. Witness Brockius testified to receiving one of these letters by mail. Out of the many letters as to which Linn testified, most of them having been admittedly mailed, it might seem strange that he would remember these indictment letters, not differing materially from

many others, to have been personally delivered. The jury was the proper judge of the weight of the evidence, and was warranted in concluding that the letters were in fact mailed.

[7] The error alleged in the admission in evidence of the transcript of record of the foreclosure proceedings in the Nevada court, of the mining property in question, is without merit. The fact that neither Linn nor his company were parties to these proceedings is not material. Before making the alleged false representations as to title, control, and operation of the property, Linn, as will be seen, had definite knowledge of the adverse possession of the property under court proceedings. The transcript merely identified the proceedings out of which arose the adverse possession which was well known to Linn.

[8] This brings us to what seems to be the main contention on behalf of Linn, and the one most earnestly pressed, viz., that the evidence does not warrant the conclusion of Linn's guilt, and that the District Court erred in overruling the peremptory motions made on his behalf. In considering this proposition reference will be made to the more salient facts bearing thereon.

The Equitable Mining Company was the owner of certain gold mining property in Nevada, upon which was located a mine, in the development whereof many years before approximately $300,000 had been expended. The mine had for many years been abandoned, or rather it remained unworked, and its deep shaft and workings had become almost filled with water.

Linn began negotiations for securing the property, and under date of August 4, 1909, entered into an agreement with the Equitable Company, which in substance provided that upon payment to the Equitable Company of $150,000 it would convey to Linn the property, and it would, on acceptance of the property by Linn, execute a deed of the property in escrow, to be delivered to Linn or his assignee when the said payment was fully made; that as part of the purchase price Linn agreed to pay or cause to be paid, within 30 days after his acceptance of the property, $6,000 of the Equitable Company's floating indebtedness then due, and to pay $6,000 of the Equitable Company's bonded indebtedness due April 10, 1910, and the balance of $138,000 of the purchase price to be paid by and out of 15 per cent. of the gross value of ores mined by Linn from the premises, such 15 per cent. to be paid each month from September 10, 1910, and the mine to be operated so actively that after six months from date of instrument the 15 per cent. shall average not less than $1,350 per month; that the Equitable Company shall within 15 days from date deliver abstract showing good title to property; that within 20 days from date Linn shall visit and inspect the property and satisfy himself that the property, so far as can be ascertained without unwatering the mine, is substantially as stated in a report on the property of April 25, 1905, by D. H. Jackson, and that immediately after examination and approval of the property and title Linn shall be placed in full possession of the property to mine and remove and sell ore therefrom, and he shall forthwith and without delay begin the work of operating the mine with as large a force of men as can be used to advantage and to continue working

the same in workmanlike manner, and that such work shall be begun by September 10, 1909. There are clauses regarding accounts to be kept, and statements to be made, and that until full payment the title shall remain in the Equitable Company, and the usual clause of forfeiture by Linn in case of his nonfulfillment of the contract, and a clause against his assigning without the consent of the company.

Under date of August 5, 1909, there appears an assignment by Linn to the New Comstock Gold Mining Company, consented to by the Equitable Company. The New Comstock Gold Mining Company was organized with a capital stock of $10,000,000, substantially all of which stock was taken by Linn as president, in consideration for the assignment of his said contract with the Equitable, for which Linn had paid nothing. Linn turned back into the company's treasury about half of the stock as treasury stock, retaining the other half.

Linn was living in Chicago, and in the latter part of August, 1909, he sent to Nevada, to inspect the property, one Felt, who had experience in gold mining, and whom he had interested in the proposition. On reaching the property he found that one Leonard was in possession under certain court proceedings in Nevada for foreclosure of a mortgage on the property, and would not permit Felt to go on to the property. Felt at once communicated with Linn, advising him of this fact. Linn thus knew early that, until the adverse claimant in possession would be removed, the Equitable Company could not comply with its undertaking to deliver him the immediate possession of the property, and he could not comply with his agreement in respect to working the mine. Felt remained there for a number of months, but never got possession of the property, and Linn testified that he himself never saw the property, and that neither he nor the New Comstock Company ever obtained physical possession or control of it, or were to his knowledge ever in situation where they could control or work the mine, or make any improvements upon it.

To meet this situation, under date of January 25, 1910, a supplemental agreement was made between the two companies wherein it was recited that the Equitable Company has been unable to admit the representative of the Comstock Company into actual occupancy and possession of the property described, "for the purpose of making examination as the contract provides preliminary to its purchase," notwithstanding the Comstock Company "had a representative on the ground for the purpose of such examination since the 8th day of September, 1909," who "has been excluded and prevented from such examination by reason of the property being in adverse custody under appointment of the court," and agreeing that the time fixed by the contract within which the Comstock Company was to enter upon and make examination of the property be extended until a reasonable number of days after the Equitable Company "shall have procured the termination or removal of the adverse custody of the property under the order of court and have admitted the representative of the party of the second part (the Comstock Company) into full occupancy for the purpose of examination and acceptance," and the time of performance by the second party of the other terms of the contract was cor-

respondingly extended. Linn signed the supplemental agreement as president of the Comstock Company.

It thus appears that the original contract, bond, or option never ripened into even a definite contract of purchase, because of the fact that Linn and his assignee had not been given opportunity for making examination of the property, as the result of which they might accept or reject it, and under the said extension the time when the Equitable Company might be required to deliver over possession was thus indefinitely postponed.

But, notwithstanding Linn and his company thus did not have even a definite option, but only one that was predicated upon the ability of the Equitable Company to give possession at some indefinite future time, there were sent out by Linn letters and circulars from which it is plain he intended the recipients to conclude that his company had absolute title, and that, coupled with such title, there was control of the property, and possession thereof, and that improvements thereon were going forward, and that a small amount of the company's stock would be sold for the purpose only of prosecuting the improvements, providing appliances, and increasing the output of the mine. The record abounds in such representations. In the indictment letter to Bailey, he says:

"$20,000 will enable us to ship 100 tons of ore per day, which will yield a profit to the company of $700 a day. All this can be done probably within 90 days. Within six months one-half of the net proceeds from the shipment of this ore can be returned to the investors. By the use of $20,000 the stock will be made worth par and when it yields 500 tons per day the stock will be worth $5 per share. It is absolutely safe and absolutely certain of results. It is not a mining proposition, but simply to provide facilities for handling the ore now in sight."

And in that to Reynolds, of May 23, 1910, he explains that for the money to be raised by these stock shares the purchaser of stock will have a first lien on half of the net proceeds of the product of the mine. He describes the assets of the company and states:

"We have more than a million and a half tons of ore." "We require an electrical drill, electric hoist, and electric apparatus to handle the ore, together with an air-compressing system by which we can readily drill and produce ore at a small cost."

The printed prospectus circulated to induce stock sales is headed, "Statement of Property Owned and Controlled by the New Comstock Mining Company." It begins, "This company owns the Flowery and North Bananza mining claims," etc., and states that the company is engaged in repairing the shaft, ready to unwater the mine; that most of the amount necessary has been provided for, but that the company did not think it wise to be short of funds, and so has decided to offer a limited amount of stock at 15 cents a share.

It is true the prospectus also states that there is a balance yet due of $150,000, and that payment must be made in about seven years, and makes mention of the deed in escrow which is to be delivered when payment is made. But this was only part of the truth, well calculated to divert intending stock purchasers from knowing of the further encumbrance of an adverse possession, and the yet further condition of

the practical nullification of the option contract through the inability of the Equitable Company to permit Linn to make even a preliminary examination of the property, the outcome of which situation, and its ultimate effect upon the transaction, being well expressed by Linn himself, who testified, "We never got possession to work it; we never got physical control." Indeed, as the evidence shows, the foreclosure proceedings in due time ripened into a sale and sheriff's deed, under which the title of the Equitable Company was extinguished.

Employing language which would be consistent only with present possession and control of the property, he wrote Mulligan:

"We are equipping this property with an electrical outfit to pump water, hoist ore, and do all things necessary by electrical power."

And to Dennis in December, 1909:

"A letter just received from Mr. Felt states that $4,500 will enable us to begin shipment of ore."

How could this be true unless they could control and operate the mine? Again, he wrote Mrs. Dennis in December, 1909:

"We are now within less than $5,000 of being able to ship 100 tons of ore per day."

To Gieselman he wrote:

"We have an electric pump on the ground, paid for, but there are other things in the way of electrical drills, electric hoist, tools, supplies, timber, lumber, iron girders, track and labor to pay for before we can get any returns from the shipment of ores."

In a letter to Ransom, as late as June 16, 1910, he stated:

"We have a very well developed mine; we are equipping our mines with electrical machinery," to "enable us to make necessary improvements in the way of drills, hoisting apparatus, electric pump," etc.

Writing to Mr. Hewitt, December 2, 1909, he said:

"We have an electric pump connected with the mine. I have been working for control of this mine for over two years. I have it now in control and with a paltry few thousand dollars will be able to ship 100 tons per day that will net the company at a low value $700 per day. The title to this property is perfect. $15,000 will place the property in a producing condition. Had I $15,000 in the bank to-day, I could assure 100 tons daily shipment within 12 weeks."

It was nowhere intimated that any of the money from stock sales was to be used for other than equipment and development purposes, nor that any of it would be applied to obtain possession and control of the mine. Indeed, in a letter of December 11, 1909, he said definitely that the stock was being offered for sale—

"to bring a developed mine to a shipping condition," and "we are selling stock to equip the mine with an electric hoist, drills, pumps, retimbering the shaft, and to procure all the necessary facilities for handling and shipment of 100 tons per day and to increase that product to 500 tons per day."

And in another letter, April 18, 1910, to Brockius, after he stated that "it requires only a few dollars to make it produce a hundred tons per day," added in a postscript:

"The $10,000 you propose investing will be used solely for the purpose of producing ore and supplying facilities to handle and market the same. Not one dollar will be used in any other channel."

Indeed, all the correspondence, far from suggesting the fact that he had not theretofore even had opportunity for examining the mine to determine whether he would accept the option, was calculated to make prospective stock purchasers believe that his company had purchased and was in possession and control of it, and actually doing work on it.

Linn's state of mind with respect to his intended effect of such representations is well shown in his explanation of what may be termed the Jones letter. Under date of November 12, 1909, after Linn had learned of the adverse possession under the court proceedings, he wrote Felt, who was still in Nevada:

"You are likely to get a message instructing you to show the mine to J. J. Jones, and do the best you can not to let him know about any trouble, if possible."

In his testimony concerning this letter Linn said:

"Felt wrote me Mr. Kennedy would not give him possession of the property. Jones was at Eureka and was superintendent of a large mine there, and Mr. Smith of Chicago wanted him to go down to look at the property with a view of putting in a large sum of money. Mr. Smith, as I learned by inquiry, was a stockyards man and had made a large amount of money in the gold fields, and at one time owned a mine in Eureka, of which Mr. Jones was superintendent. I wanted to show Mr. Jones the best we could the mine under the conditions that might exist when he arrived there. * * * I made the statement *because if Mr. Jones had found out about any trouble it might have had a bad effect on Mr. Smith investing.*"

Is it reasonable to believe that Linn was any less considerate of Smith, to whom he intended through suppression of the facts to sell stock, than he was of Bailey, Reynolds, Brockius, and the others, named and unnamed, to whom he was likewise trying to sell stock?

With respect to the charge in the indictment as to the false representations of a $5,000,000 offer for the property, in a letter from Linn to Hewitt, December 2, 1909, he said:

"I saw a man a few days ago who offered us $5,000,000 for this property, and he said he remembered the time when 1,000 shares of stock in the old Comstock was sold in London, England, for $1,400,000."

In explanation of this, Linn at first testified a man by the name of Parker was going to give him $5,000,000 for the mine. A little later he testified:

"He said he studied the reports, and studied all that he could find out about it, and said, if it was unwatered and they could get into it, they would be willing to take that on an option of $5,000,000. In mining, an option of purchase is considered a purchase. He said, if they could get the mine, if there was no water on it, he would take an option on it for $5,000,000 for the property, and have a certain time to pay for it. We were not in position to do that, because the mine was under water. The proposition was that we had first to unwater the mine before we could get the $5,000,000. He would not pay without examining it. Parker professed to represent a syndicate. I said it was not for sale, but they kept saying they would pay $5,000,000 as quick as we would unwater the mine and let them in and they could examine it and find the ore present. If the water was out, and they could go down

and found $1,500,000 blocked out and $5,000,000 in sight, they would pay $5,000,000."

Linn thus gradually minimized the proposition from an unqualified offer of $5,000,000, as stated in the Hewitt letter, to an offer to take an option at that price, conditioned on Linn's removing the water, and an examination showing $1,500,000 of ore blocked out and $5,000,000 more in sight. Linn's testimony does not justify his representation that an unqualified offer of $5,000,000 for the property had been made.

The fact that Linn had the abstract of title of the property examined and had legal advice thereon does not alter the situation. The evidence shows that his lawyer advised him that title was good in the Equitable Company, subject to a mortgage or trust deed to secure a bond issue. It does not appear that any lawyer advised him he might with impunity undertake to sell stock to intending purchasers through knowingly false representations of present title, control, possession, and operation of the property, and of a fabulous offer for it, and employ the post office establishment to help carry out such a scheme. And it is plain that such advice, if given, could afford him no protection.

The insistence that Linn honestly believed this property had great possibilities, and that, if he could get hold of it and work it, large profits would speedily come to himself and to those whom he might induce to purchase shares of the stock, may be conceded. But when, in order to raise money, he devises a scheme to represent to intending stock purchasers that his company had present title, possession, control, and operation of property, and a vast offer for it, when all this, to his certain knowledge, was false, then these constitute the scheme or artifice to defraud these intending purchasers into making purchases they would not otherwise make, and is to be considered wholly apart from the faith which Linn might have, that if, in this manner, he might raise sufficient funds, he would then get hold of the property, and make vast profits for these same intended investors.

He has been described as an enthusiast or optimist, with unbounded faith in the ultimate outcome of his prospect. While men may not be convicted for acts done in good faith, nevertheless schemes and devices to induce the making of stock investments which plainly would not otherwise be made, by the knowingly false representation of material facts and conditions, show a culpability which enthusiasm cannot justify, nor optimism excuse.

Finding as we do that there is evidence to sustain the verdict, there was no error in overruling the peremptory motions to instruct the jury.

The judgment of the District Court is affirmed.