## MOORE et al. v. UNITED STATES. *

(Circuit Court of Appeals, Seventh Circuit. July 16, 1924. Rehearing Denied November 6, 1924.)

Nos. 3173, 3204, 3205, 3206.

**1. Post office ⊂⊃48(4)—Indictment for using the mails to defraud must allege that defendant deposited or caused to be deposited the illegal matter in the mails.**

To state the offense of using the mails to defraud under Criminal Code, § 215 (Comp. St. § 10385), the indictment must allege that defendant deposited, or caused to be deposited, in the mails matter in execution of the alleged fraudulent scheme.

**2. Indictment and information ⊂⊃79—Clerical error held not to invalidate indictment for using mails to defraud.**

Where an indictment against several defendants for using the mails in execution of a fraudulent scheme alleged that the scheme was devised and the false representations were made by "the defendants," a further allegation that "said defendant" well knew the scheme to be fraudulent, etc., must be taken as a clerical error and the word "defendant" read as "defendants."

**3. Post office ⊂⊃48(4)—Indictment for using mails in execution of scheme to obtain money by means of false and fraudulent representations held good.**

Under Criminal Code, § 215 (Comp. St. § 10385), which, inter alia, makes it an offense to use the mails in execution of a scheme "for obtaining money or property by means of false or fraudulent pretenses, representations or promises," in an indictment charging the making of false and fraudulent representations respecting a corporation, the stock of which was offered for sale through the mails, it is not essential to allege that purchasers of the stock would not receive value equal to the amount paid for it.

**4. Criminal law ⊂⊃622(1)—Granting of separate trials to defendants jointly indicted discretionary.**

The granting of separate trials to defendants jointly indicted is within the discretion of the trial court, though some counts are dismissed as to some defendants.

*Certiorari denied 45 S. Ct. 354, 69 L. Ed. —.

**5. Post office ⊂⊃49—Evidence held admissible in prosecution for using mails to defraud.**

In a prosecution for using the mails in execution of a scheme to sell stock of a corporation in respect to which false and fraudulent representations were made, evidence was properly admitted as to the history of the corporation and the events leading to its organization.

**6. Post office ⊂⊃49—Evidence that permits to sell stock of corporation in certain states had been denied held admissible.**

In a prosecution for using the mails in furtherance of a fraudulent scheme to sell stock of a corporation, evidence held admissible to show that application had been made for permits to sell the stock under the so-called "blue sky" laws of certain states and denied.

**7. Criminal law ⊂⊃304(9)—Judicial notice taken of state statutes.**

Federal courts take judicial notice of the statutes of all the states.

**8. Criminal law ⊂⊃1170(1)—Exclusion of evidence held harmless, in view of evidence admitted.**

Where defendant, charged with using mails in furtherance of scheme to defraud in sale of corporate stock, embracing representation that prominent citizens constituted advisory board of directors, testified that he saw letters from many of such alleged advisory directors permitting use of their names, and honestly believed consent had been obtained, exclusion of testimony as to his recollection of the names of those whose letters he saw held harmless.

**9. Criminal law ⊂⊃655(1)—Remarks of the court held not prejudicial.**

Remarks of the court during a trial held not prejudicial error, in view of the entire record.

**10. Post office ⊂⊃35—Belief in scheme does not justify promotion by fraudulent representations.**

In a prosecution for using the mails to sell stock of a corporation by means of false and fraudulent representations, it is not a defense that defendants honestly believed that by securing the necessary capital the corporation would be highly successful and that purchases of the stock would be profitable investments.

In Error to the District Court of the United States for the Eastern District of Illinois.

Criminal prosecutions by the United States against George L. Moore and others, against Edward K. Gallagher, against Albert C. Leonard, and against J. W. Patt. Judgments of conviction, and defendants bring error. Reversed as to count 1 of indictment, and affirmed as to all other counts.

Bryan H. Tivnen, of Mattoon, Ill., for plaintiffs in error Patt and others.

Bryan H. Tivnen, of Mattoon, Ill., and W. J. Ford, of Los Angeles, Cal., for plaintiffs in error Moore, Gallagher, and Leonard.

James G. Burnside, of Vandalia, Ill., for the United States.

Before ALSCHULER, EVANS, and PAGE, Circuit Judges.

ALSCHULER, Circuit Judge. Plaintiffs in error were convicted and sentenced under an indictment charging violation of section 215 of the Penal Code (Comp. St. § 10385). In general, they were charged with devising a scheme for obtaining money or property by means of false and fraudulent pretenses, representations, and promises in the sale or attempted sale of certain corporate stocks, and using the mails for the purpose of executing the scheme. The indictment has 11 counts. The first sets forth the alleged scheme, which is by reference charged as the scheme in the next 9, and in each of these counts mailing of letters in execution of the scheme as charged. The eleventh, charging conspiracy, was nollied.

Defendants Moore and Gallagher were each convicted and sentenced on counts 1, 3, 4, 5, 6, 7, 8, 9, and 10, Patt on 5, 6, 7, 8, and 9, and Leonard on 1, 3, 4, 8, and 9. The record and briefs for plaintiffs in error are voluminous, and assignments of error are many, of which we will here discuss such only as we deem of some gravity.

[1] 1. It is contended that the first count, which charges use of the mails through depositing in the post office for mailing a circular set forth in the count, fails to charge that the defendants, or any of them, deposited the circular or caused it to be done. In this the count is fatally defective, and conviction thereunder cannot stand. This applies to defendants Moore, Gallagher, and Leonard, who were each convicted under this as well as other counts.

[2] 2. It is urged that in the scheme stated in the first count the charge of knowledge of the falsity of the representations and promises set forth fails to charge the knowledge in the "defendants," but employs the singular "defendant," leaving it uncertain which of the six defendants charged is the one who possessed the knowledge of the falsity of the representations and promises. This is so, and, if this is an insufficient statement of the scheme, the objection affects all the counts in issue, since it is the scheme stated in them all. Upon this proposition, and the previous one considered, we have not the benefit of the views of counsel for the government, nor indeed upon some of the others.

In stating the scheme, the representations and promises are charged as made by the *defendants* to obtain money from persons who should be induced to send their names to the *defendants*, and that the *defendants*

planned and schemed to obtain the money from these persons through their purchasing from the *defendants* and the corporation shares of stock on pretenses, representations, and promises made by the *defendants* to them, and that the *defendants* intended by said pretenses, representations, and promises to have the purchasers understand the things represented, which pretenses and promises *said defendant,* when so devising said scheme, well knew to be false and fraudulent pretenses, etc. The expression "said defendant" indicates a previous reference, but these previous references are to the whole body of defendants, and there is nothing in the indictment itself to indicate any intention of singling out any one or more from the whole body of the defendants named. Such allegation of knowledge would be meaningless in this connection, unless it be assumed that the singular form was a clerical omission, a conclusion which the context makes absolutely necessary. The word must, in our judgment, be read as if it were plural, as it was manifestly intended to be.

The situation is quite different from that in People v. Hallberg, 259 Ill. 502, 102 N. E. 1005, which is with apparent confidence cited for plaintiff in error. The indictment there charged two defendants with committing an offense at a time so remote as to raise the bar of the statutory limitation. This, appearing on the face of the indictment, made it bad, unless there further appeared allegations which would toll the statute. Evidently for this purpose the indictment recited "the said defendants (naming them) not being *a resident* within the state of Illinois." It was held that the expression "a resident" could not be construed as being *residents,* and that the indictment, not referring to both of the defendants in this essential respect, was bad. If it be assumed that this conclusion is correct, nevertheless such particularity is not required in the setting forth of the scheme under section 215, which in the indictment here should be read in accordance with its unquestionably manifest intent and purpose. Colburn v. United States, 223 F. 590, 139 C. C. A. 136.

[3] 3. It is urged that nowhere in the statement of the scheme is it set forth that the stock would be valueless, or of substantially less value than would be represented, and that, for anything appearing in the indictment to the contrary, the victims of the alleged scheme would receive value equal to that with which they were to part. The scheme charged was to obtain money from

a class of persons by means of false and fraudulent pretenses, representations, and promises whereby stock of the company was to be sold to the intended victims, and that all the moneys paid for the stock should go into the treasury of the company; that the company was doing its own financing, and that no underwriters or brokers were interested; that the company was able at that time to produce 50 to 75 automobiles per week, and make a profit as it went along, and was able to go ahead financially without fear of interruption; that the company had a surplus of $597,744.20, and had an advisory board of directors of high type included in the organization, which advisory board assisted in the management of the company, and in formulating and directing its policies; that the company had contracts for 23,711 automobiles, involving over $13,-000,000; that the business had been carried to its third successful year, and had no expensive experimental stage to go through; that the estimated profits of the company would be $2,425,000 per annum, and that on November 1, 1919, the company was producing 50 cars a week, and by January, 1920, would be producing 75 cars a week, and would pay large dividends on common stock during 1920; and that the stock was worth more than the price to be paid for it, and will pay large dividends annually, and be a profitable investment for the investors—all of which representations were charged to be false, and so known to be by the defendants when they would be made.

Certain it is that, if the representations and promises set forth in the scheme had been true, the stock to be sold would have been worth very materially more than if wholly false and unfounded. While the indictment is not artfully nor carefully drafted, we think there is sufficient in the statement of the scheme to make it apparent that the value of the stock to be sold would be substantially less than the price at which it was to be purchased. Of the holding by this court in Miller v. United States, 174 F. 35, 98 C. C. A. 21, to the effect that counts of the indictment there under consideration contained "no averment whatever respecting the value of such stock so to be exchanged for the $5,000," it may be said that the case arose under the law as it was before the amendment of March 4, 1899, by which there was added, after the then existing clause, "whoever, having devised or intending to devise any scheme or artifice to defraud," the words, "or for obtaining money or property by means of false or fraudulent pretenses, representations or

promises." The added words were evidently intended to enlarge the scope of the act, and to denounce and punish the use of the mails in execution not only of a scheme to defraud, but also of a scheme to obtain money or property by means of false representations or promises, and would in its terms include any scheme to obtain money from another by means of false pretenses, under circumstances where, but for the false pretenses or promises, the money or property would not have been parted with.

It would seem by the terms of the statute that the use of the mails in execution of such a scheme would transgress the law, regardless of the value of that which was received in exchange. The element of injury, if any, through lesser value of the thing to be received by the victim than of that with which he parts, while probably affecting the degree of culpability, in our judgment would not go to the extent of vitiating an indictment which in the statement of the scheme did not allege such lesser value or entire absence of it. We cannot hold these counts of the indictment insufficient in this or the other alleged respects.

[4] 4. Error is alleged on denial of motion at the close of the testimony that defendants Moore, Gallagher, and Leonard be tried separately from the other defendants on the remaining counts wherein they are joined, and that defendants Patt, Vickers, and Biehl be separately tried on such of the counts wherein they remained charged with the other defendants. It appears that on motion certain of the defendants were dismissed from certain of the counts, but leaving them joined in certain others. It is insisted that under these circumstances the motion should have been granted. We see nothing to take the case out of the very general rule that the granting of separate trials to those jointly indicted is within the discretion of the trial court, and the record discloses nothing to indicate abuse of the court's discretion in denying the motion.

[5] 5. Of the errors assigned upon admissibility and exclusion of evidence, none need be here discussed, save those below mentioned. The evidence admitted of the early history of the company and of the events leading to its organization was objected to. We see no error in this. Facts relating to the origin and development of the enterprise under consideration may ordinarily be shown by either party, and indeed it is apparent that many of such are confidently relied upon by the defendants, or some of them, as indicating their good faith in all they did.

[6, 7] 6. It is urged that the court erred in admitting for the government testimony of representatives of governmental agencies of Minnesota and Illinois having charge of the so-called "blue sky" law activities and records, to the effect that application to sell stock of the company under the blue sky laws of these states was made and denied. The precise point was raised in Pandolfo v. United States (C. C. A.) 286 F. 8, and we see no reason for departing from what we there said in holding it was not well taken. But it is claimed there was no evidence offered here of the existence of blue sky laws in Minnesota and Illinois. Suffice it to say, federal courts take judicial notice of the statutes of all the states.

[8] 7. It is urged that serious error intervened in sustaining objection to certain questions asked of plaintiff in error Gallagher respecting the advisory board of directors. One of the alleged pretenses was the existence of an advisory board of directors of prominent citizens which had a voice in directing the business and policies of the company. Two, out of many more whose names appeared in such capacity, testified on the trial that they were not aware of being on such a board. The others did not testify. Gallagher testified to having seen in the files of the company letters from various ones of the others, from which it appeared they consented to act as such. It seems the only question to which objection was sustained was as to his recollection of the names of those whose letters he had seen, the letters themselves being lost. If he did represent that there was such a board, he would have been entitled to testify to such facts as would tend to indicate his good faith in so doing, and, had he been denied permission to testify on the subject, a far more serious question would be involved. But he testified to practically everything upon the subject that would be of benefit to him. Being asked what he knew about the advisory board, he said the names were secured by Mr. Wilson, who had these men's permission to serve as advisory directors. He said, "I know they gave their permission, because I saw a lot of letters," which letters he said he had searched for, but they could not be found, but he recalled having had them. He said he did not recall himself having had any correspondence about that matter, and that he did not intend to deceive in the use of these names, but that he honestly believed consent had been obtained. His statement of the names from his recollection of these letters would have added little or nothing to the effect of his testimony that he knew these men had given their consent, because he saw the letters, and no possible harm ensued from sustaining the objection to the question calling for the names.

[9] 8. Certain remarks of the court and of the district attorney in the course of the trial are insisted upon as erroneous and harmful. We have carefully examined them. Some of the court's statements standing alone might seem inexcusable and harmful, but we have considered them in connection with the entire record, and, without justifying them, we cannot but conclude that no harm resulted. The most serious was that counsel for plaintiffs in error were not fair in their dealing with the court, but the context shows that the statement was made in connection with repeated objections which raised the question of the validity of the indictment, and presented a question which the court said (and was not denied) was not urged at the time the demurrer to the indictment was heard and disposed of, and it culminated in the court's statement to counsel, after the trial had been in progress a number of days, that the jury might be withdrawn and the question could be, as it was, then considered. The jury was told that the entire subject was not a matter for them, and if they comprehended the situation at all must have understood that the court had reference, not to the merits of the defense, but to the making of such objections during the course of the trial. In the remarks of the district attorney objected to we find nothing which rises to the dignity of an error.

[10] 9. But all through the over 600 pages of printed brief and argument for the defendants runs the contention that the entire record fairly discloses that the defendants were undertaking to finance this enterprise in the hope and belief that it would meet with a high degree of success, which would abundantly repay every investor to the full, and that it was not the intent and purpose that any one should ultimately sustain a loss through investing in the company's stock. Examination of the record fairly justifies this assertion. It appears highly probable that they entertained the confident hope of ultimately bringing the enterprise to a state where all investment therein would prove profitable. We may even say that this element is here present in larger degree than in most stock-selling schemes. If this alone would absolve from criminal responsibility for the making of false representations for procuring capital, and using the mails in furtherance, plain-

tiffs in error ought not to have been convicted. But can this hope and belief of ultimate success justify the employment of any and all means, and the promulgation of any plan or artifice to secure money for the enterprise? What we conceive to be the law respecting such a situation we stated in Linn v. United States, 234 F. 543, 552, 148 C. C. A. 309, 318:

"The insistence that Linn honestly believed this property had great possibilities, and that if he could get hold of it and work it large profits would speedily come to himself and to those whom he might induce to purchase shares of the stock may be conceded. But when, in order to raise money, he devises a scheme to represent to intending stock purchasers that his company had present title, possession, control, and operation of property, and a vast offer for it, when all this, to his certain knowledge, was false, then these constitute the scheme or artifice to defraud these intending purchasers into making purchases they would not otherwise make, and is to be considered wholly apart from the faith which Linn might have that if, in this manner, he might raise sufficient funds, he would then get hold of the property, and make vast profits for these same intended investors."

And in Pandolfo v. United States (C. C. A.) 286 F. 8, 13:

"But if we concede his absolute belief that the company would eventually build and profitably operate on a large scale the automobile plant, if it could secure the necessary capital, this would not justify him in securing the capital from others by means of false and fraudulent representations and promises."

10. In this view of the law, the only remaining question we need consider is whether the record discloses evidence which, if the jury believed it, warranted the finding that plaintiffs in error had used the mails in the execution of a plan to obtain capital for this company by false pretenses and promises alleged in the indictment. It is not seriously contended, and could not well be, that the record does not disclose such evidence. This court is not the trier of facts, and does not review them, save only to ascertain whether there is evidence which, if believed, will warrant the verdict.

11. On behalf of Patt the insistence is especially urgent of his want of criminal connection with the alleged scheme. It is said he never was an officer of the company and did not become substantially active in its stock sales operations until 1919, two years after Wilson, the original promoter and financial agent, had inaugurated an extensive stock selling plan. True, it was not until 1919, that he came into commanding position in the plan of stock selling, but he was employed during the Wilson regime in the sale of this stock, and after Wilson died became the central figure in its sale. He organized a sales corporation, giving it his name, whose sole business was selling this stock, and Moore resigned the presidency of the motor company to participate in its activities. His knowledge of the falsity of flamboyant and false representations and promises made to foist this stock upon the dupes, who would thus be induced to buy it, abundantly appears from the record. Patt's clerk (whom he subsequently married) went through the form of buying a large amount of the company's stock, giving her note for $275,000 therefor, and it was this and other stock which Patt's company was selling to the public. Although not an officer of the motor company, he was largely instrumental in organizing one of those all too familiar whirlwind spectacular stock selling "campaigns," wherein recklessness with facts and prodigality of promises are prime factors.

We have examined carefully all the questions which counsel for plaintiffs in error, with great diligence and industry, have brought to our attention, and are satisfied that no substantial error appears.

The judgment is therefore affirmed, except as to count 1 of the indictment, and as to count 1 only the judgment is reversed.