### PANDOLFO v. UNITED STATES.*

(Circuit Court of Appeals, Seventh Circuit.   August 21, 1922.   Rehearing Denied January 24, 1923.)

No. 2787.

**1. Post office ⬡⟹35—Belief in scheme does not justify promotion by fraudulent representations.**

The fact that accused believed that his company would eventually build and profitably operate a manufacturing plant, if he could procure the necessary capital, and that he reinvested his profits on the basis of that belief, does not justify him in securing the capital from others by means of false and fraudulent representations and promises, or absolve him from the charge of using the mails to defraud.

**2. Post office ⬡⟹49—Evidence held to sustain charge of fraudulent scheme to sell stock.**

In a prosecution for using the mails in furtherance of a scheme to defraud, evidence showing representations by the promoter of a company that there were no promoters' fees, that the purchase price of the stock above the par value was surplus, and that the company would soon be operating at a handsome profit, *held* sufficient to establish the fraudulent character of the scheme, where it appeared the promoter received the amount paid above the par value of the stock, and had no reason to believe the company would operate within the time promised.

⬡⟹For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

*Certiorari denied 43 Sup. Ct. 433, 67 L. Ed. ——.

**3. Post office ⬅48(8)—Fraudulent scheme proved held not a variance from allegations.**

In a prosecution for using the mails to defraud in the promotion of a corporation to manufacture automobiles, evidence *held* to establish the scheme charged in the indictment, so that there was no variance.

**4. Criminal law ⬅438—Exclusion of moving pictures of plant operated by corporation held not abuse of discretion.**

In a prosecution for using the mails in aid of a fraudulent promotion of a corporation, where a large amount of evidence on behalf of defendant was admitted showing the actual construction of the plant, it was not an abuse of the trial court's discretion to exclude from evidence motion pictures taken at the plant under the direction of the advertising agent of the corporation.

**5. Criminal law ⬅1166½(12)—Remark of court reflecting on advertising manager of defendant corporation held harmless.**

A remark by the trial court, in excluding from evidence moving pictures of the plant of the corporation promoted by defendant, on the ground that the advertising manager had directed the work of taking the pictures, to the effect that the court judicially knew an advertising manager's purpose was not to reproduce a thing as it normally is, was not prejudicial to accused as implying the advertising matter of the corporation was false, where accused conceded that there was exaggeration in the advertising matter, and the evidence showed that the so-called exaggeration amounted to a materially false representation.

**6. Post office ⬅49—Misrepresentations by his stock salesman admissible against promoter prosecuted for use of mails to defraud.**

Where the promoter of a corporation, as its fiscal agent, issued circulars to prospective subscribers for stock, falsely representing the situation of the corporation and vigorously urged his agents to sell the stock, no fine line can be drawn between his own representations and those of his agents, so that the latter were admissible in evidence against him.

**7. Post office ⬅49—Investigation of conduct of journals publishing flattering reports of fraudulent scheme held proper.**

In a prosecution for using the mails in furtherance of a fraudulent corporation promotion scheme, where it appeared that two journals having high-sounding names had published highly laudatory articles concerning the corporation, and that many copies of those journals were purchased and circulated in the interest of stock selling, it was not error for the court to conduct an inquiry into the business methods of those papers, especially where much of it was had out of the presence of the jury.

**8. Criminal law ⬅396(2)—Admission of government report, referred to in defendant's testimony, held proper.**

Where defendant had introduced in his own behalf a report of a committee of stockholders which expressly referred to charges made against defendant in a report by the government capital issues committee to Congress, and exonerated defendant from the charges in the government report, it was not improper to receive the latter report in evidence as a part of defendant's cross-examination.

**9. Criminal law ⬅1169(2)—Admission of government report adverse to scheme held not prejudicial.**

Where defendant had introduced in his own behalf a report by a committee of stockholders exonerating him from charges made against him by a government report, in which the committee referred to "charges of the most serious nature" contained in the government report, accused was not prejudiced by the admission in evidence of the government report, since the reference to the charges in the other report was no less harmful to him.

⬅For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

10. **Affidavits** ☞18—**Affidavits referred to in letter of defendant, offered to show attempt to influence witnesses, held inadmissible.**

Where the government offered in evidence a letter written by defendant to witnesses for the government as tending to show an attempt to influence their testimony, it was not error to exclude evidence offered in defendant's behalf, consisting of affidavits on which he claimed to have acted in writing the letter, since the effect of the letter did not depend on the truth of the assertion therein that accused had such affidavits, and those affidavits were improper to establish the facts therein stated.

11. **Post office** ☞49—**Correspondence with blue sky commissions relative to permits to sell stock held admissible.**

In a prosecution for using the mails in furtherance of a fraudulent scheme to promote a corporation, correspondence between accused and the blue sky commissions of various states relative to securing permits to sell stock of a corporation in those states, was admissible as acts of official bodies with reference to matters committed to them for the purpose of showing that information as to defendant's participation in the proceeds of the stock sales was withheld from the commissions.

In Error to the District Court of the United States for the Eastern Division of the Northern District of Illinois.

Samuel C. Pandolfo was convicted of using the mails in furtherance of a scheme to defraud, and he brings error. Affirmed.

Plaintiff in error, Pandolfo, with 12 others, was tried under an indictment of 11 counts, the first 10 charging violation of section 215 of the Penal Code (Comp. St. § 10385), and the eleventh a conspiracy under section 37 (Comp. St. § 10201), to violate section 215. Count 1 charged that the defendants devised a scheme to obtain money by means of false and fraudulent representations and promises, to induce persons to buy shares of stock in the Pan Motor Company, the false representations charged being in effect that of each $10 to be paid for each share of stock half would go to the credit of capital, and the other half to surplus for additional working capital; that the company had paid and would pay no fees to promoters; that the stock was worth more than the sale price of $10 per share, and would pay large dividends annually, and would be a profitable investment for purchasers; that the Pan Motor Company was manufacturing, and intended and would continue to manufacture, large numbers of tractors, which it would sell to the public for $1,495 each, and to stockholders at 15 per cent. less, whereas all such representations and promises were to the knowledge of defendants false and fraudulent; and that in furtherance of such scheme and artifice to defraud a certain letter was mailed. Counts 2 to 10, inclusive, charged the same scheme, each count setting up the mailing of a different letter in furtherance thereof. Count 11 charged conspiracy to commit the offenses charged in the other counts, setting forth as overt acts the mailing of the same and other letters, and the doing of certain other things. Pandolfo was found guilty on counts 1, 2, 3, and 5, and not guilty on the other counts, the other defendants being acquitted. On each of counts 1 and 2 he was sentenced to 5 years' imprisonment to run concurrently, and on each of 3 and 5 to 5 years, also to run concurrently, beginning at the expiration of sentence on counts 1 and 2. A fine of $1,000 was imposed under each of the 4 counts. The trial lasted about 7 weeks, the transcript is nearly 3,400 pages, although the bill of exceptions is largely in narrative form.

P. J. Lucey, Bernhardt Frank, and Gerald G. Barry, all of Chicago, Ill., for plaintiff in error.

Sylvester R. Rush, of Chicago, Ill., for defendant in error.

Before ALSCHULER and EVANS, Circuit Judges, and GEIGER, District Judge.

☞For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

ALSCHULER, Circuit Judge (after stating the facts as above). The propositions relied on in briefs and arguments as ground for reversal are: (1) There was no evidence to sustain the counts; (2) the evidence for the government was based upon the conspiracy count alone; (3) there is fatal variance between the scheme as charged in the indictment and the evidence adduced for the government; (4) there was error in denying defendants the right to show to the jury moving pictures of the plant, and in the comments of the court on making his ruling thereon; (5) the court erred in admitting in evidence representations to prospective stock purchasers by stock salesmen, not parties to the indictment; (6) all the substantial evidence is at least as consistent with Pandolfo's innocence as with his guilt; (7) the court erred in conducting an investigation into the affairs of "The Bankers,' Merchants' and Manufacturers' Journal" and "Bankers' Journal"; (8) there was no evidence to show the mailing or receipt of the letters alleged in counts 1 and 5 to have been mailed; (9) there was error in admitting in evidence the report to Congress of the capital issues committee; (10) the court erred in excluding certain affidavits respecting Pandolfo's letter of October 5, 1917; (11) there was error in admitting in evidence application to "blue sky" commissions of several states and correspondence relating thereto.

Propositions 1, 2, and 6 practically involve the question whether there was evidence to sustain the verdict, and the challenge thus made and earnestly maintained has necessitated careful inspection of entire transcript. Only some of the more salient facts can be here presented. For a number of years preceding 1917 Pandolfo was operating extensively in Texas and vicinity, and had evidently developed great facility in organizing and conducting "campaigns" for the sale of intangible things, such as insurance. It appeared that in a short time he had built up there a very extensive, widespread insurance business, employing a great corps of agents. But ultimate financial success did not attend these efforts, and the business went to pieces leaving Pandolfo heavily in debt. In casting about for employment for his unusual talents, he hit upon the automotive industry, and conceived the plan of organizing a corporation for making primarily automobiles, also tractors, trucks, and other things, with capital stock divided into $5 shares, to be sold at $10 per share, of which he would receive half for organizing and selling the stock. With his characteristic activity and intensity, he proceeded to exploit his plan, and soon organized a body of agents to sell stock. He had no manufacturing experience whatever, and, beyond having used automobiles, was not experienced in their production or sale.

In 1916, while yet in the Southwest, and before any plans had been made for a plant or even a location, he prepared and widely circulated Government's Exhibit No. 6 in an effort to obtain stock subscribers. Exhibit 6 is an excellent example of the perfervid emanations of the stock-selling promoter, who sets about to fire the imagination of prospective customers, and at all hazard sell them stock. It depicts in gorgeous colors the proposition in hand, and proclaims the success achieved by others who have been pioneers in the line, care-

fully avoiding, of course, all reference to the infinitely greater number of financial wrecks and failures strewn along the pathway. Other literature points out wonderful achievements in other lines; Bell Telephone and other notables coming in as the usual citation of instances where small original investments have produced marvelous results. Specifications of an automobile were set forth, taken largely, if not wholly, from the descriptions of well-known machines on the market. Exhibit 6 was much circulated both before and after the incorporation, and is typical of the enormous volume of literature with which for about two years Pandolfo flooded the country for stock-selling purposes.

By the last of 1916 considerable stock had been subscribed, and then Pandolfo came to Chicago, from which place for quite a number of months he conducted the campaign. The company was chartered early in January, 1917, and on January 15 he sent out a letter, addressed to "Dear Subscriber," in which it was stated, among other things:

"Hurrah for the Pan Motor Company! Three cheers for the coming giant of the automobile world! The Pan Motor Company was incorporated on Tuesday, January 9, for $5,000,000, under the laws of Delaware. Our stock certificates are printed and in the office. In a few days the stock certificates will be made out and mailed to all those who have fully paid their subscriptions. Inclosed you will find a booklet which was printed before incorporation. (Exhibit 6.) Please read it carefully."

Then follows eloquent urging that subscribers promptly pay up their subscriptions, complimenting the "loyal bunch of subscribers," asking each subscriber to interest a relative or friend, and offering a prize for each subscription obtained before Christmas. Upon organization of the company a written agreement was made between the company and Pandolfo, reciting the securing by Pandolfo as fiscal agent of many advance subscriptions for stock, designating him as "exclusive fiscal agent," on condition that there be turned into the company the net amount of $5 in cash for each share sold; that the sale price of each share of stock shall be not less than $10, and that for every share of the company's stock theretofore or thereafter sold Pandolfo shall receive the first half of the amount subscribed to compensate him for his services as exclusive fiscal agent. From other provisions of the contract, though it is not entirely clear, we conclude it was intended to provide that the expense of selling the stock, such as advertising, agents' commissions, and the like, should be borne by Pandolfo. The contract term was two years, with privilege on the part of Pandolfo to renew for another year, if within two years the $5,000,000 capital, or any increase, is not disposed of. Pandolfo agreed also to pay the expense of carrying on the corporate business until such time as the corporation had in bank not less than $30,000, but in any event he was to have the right to appoint engineers, superintendents, and general manager of factory for a year after construction began; also exclusive right to designate location of first factory.

In the latter half of 1917 some changes were made in the contract, decreasing his compensation to 25 per cent. Apparently this was in

deference to the "blue sky" commissions of certain states, which limited promotion and stock-selling expenses greatly below the 50 per cent. But a resolution was adopted by the company for its paying certain expenses theretofore borne by Pandolfo. Some time later still further reduction in his compensation was made, but provision also made for payment of yet more of the expense by the company. The stock-selling campaign proved very successful, realizing from 50,000 to 75,000 subscribers, mostly in small amounts, and generally on installment payments. Pandolfo, being entitled to the first half collected, would have the benefit of the first payments up to half the sale price. Thus Pandolfo received considerably more than half. of what was collected. But this was not all profit to him; in fact, agents' commissions were large, and there was much expense involved in advertising. The figures are somewhat involved, but his net personal profit was not less than $350,000, and there is evidence from which the jury could have found it to be over $600,000.

[1] In the fore part of 1917 St. Cloud, Minn., was fixed on as the location of a manufacturing plant, a large tract secured, and construction begun. Several large, substantial buildings were completed and equipped with expensive machinery, involving, with other outlay for corporate business purposes, expenditure by the company of about $2,000,000. Indeed, this large outlay, wherein it does not appear that Pandolfo personally profited, is the prime basis of the earnest contention that his entire good faith in all these matters conclusively appears from the evidence; and as further and not less conclusive badge of his good faith, and as indicating his own belief in the success of his ambitious plans for the company it is pointed out that Pandolfo, after payment of his prior debts, invested a very large amount of his own funds realized from these stock sales in the building of 60 houses and a hotel in the immediate vicinity of the plant. But if we concede his absolute belief that the company would eventually build and profitably operate on a large scale the automobile plant, if it could secure the necessary capital, this would not justify him in securing the capital from others by means of false and fraudulent representations and promises. Such circumstances might bear on the degree of culpability, but do not of necessity absolve from the charge. Sparks v. United States, 241 Fed. 777, 154 C. C. A. 479; Linn v. United States, 234 Fed. 543, 148 C. C. A. 309; Foster v. United States, 178 Fed. 165 (172), 101 C. C. A. 485.

[2] A scheme charged was that of obtaining money by falsely and fraudulently representing that of the proceeds of the sale of stock half was to be capital and half surplus of the company for additional working capital, and that practically there would be no fees to promoters; also that the stock was worth more than $10 per share, and would pay large dividends. That such representations and promises were made, a few of many items of evidence thereon will serve to show. Subscription blanks for stock stated, "Price $10 per share. Surplus and par value of capital shall be of equal amount." In a letter of November 4, 1916, Pandolfo said:

"Will kindly ask you to take a silent oath to keep the statements herein contained as strictly confidential, because if our plans became generally known it might mean their adoption by our competitors. The first, largest, and only co-operative automobile factory in the world is organizing. It is called the Pan Motor Company (short for Pan-American). The capital stock will be $5,000,000—surplus $5,000,000, shares $10 each. * * * You are invited to join the coming giant of the automobile world."

Exhibit 6 states:

"Its tangible assets will be greater than the par value of its stock right off the bat when the stock is all sold. Its premium value should be much more than that. Our subscribers agreed to pay $10 per share for our stock— one half goes to the credit of capital and the other half goes to the credit of surplus. We are not selling our stock at a discount. We never did. We are selling it at a premium. It is worth more than we are selling it for, and I think should easily earn a reasonable dividend at 10 times the present selling price the first year, to say nothing of the future. We think that 25 shares of this stock in 10 years will yield enough income to keep comfortable any ordinary family, independent of any other source."

Exhibit 127, a long and fulsome document, prepared before incorporation, bears on its title page the emblem "No Promotion Fees," and the statement that when the company is organized its assets will equal the par of all outstanding stock and that the premium value should be at least as much more. Later issued advertisements hold out glowing promise of large and immediate profits. A circular of May 14, 1917, refers to orders placed and to a possible 25 per cent. dividend the first year on $1,000,000 paid-in capital, and one sent out the next day raises the dividend possibility to 30 per cent. on such capital. Likewise there was evidence wherefrom the jury might fairly have concluded that the representations of large profits from immediate manufacture and sale of the product were not truthful, and were not made in good faith. Exhibit 6 says:

"We intend to begin marketing our cars by February, 1917. You ought to see the plans and specifications of our car. Its the hottest thing that ever came down the pike. A real standardized car, * * * yet with some new practical, common sense ideas. It is safe to say we have now more cars sold than we can make in 6 months after we start to deliver."

The whole exhibit is designed evidently to convey the impression that everything is in shape for large deliveries and huge profits, beginning almost at once, and to convince the reader that he should subscribe, and "Do it right now. The man who waits misses the train," concluding with advice of Rockefeller, Depew, and Westinghouse on the subject of prompt investment. A letter of November 4 states that "our model Pan car is already designed and is the classiest thing in the world selling for $600," and stating the plan to have 100 exhibition cars ready by January 15, 1917, and that 30,000 cars will be manufactured in 1917, and that $100 of Pan stock should make you rich. "No Promoters' Fees," "Unimpaired Capital," "Surplus," "Large and Immediate Profits," seemed to be the campaign slogans. "Surplus," as applied to corporations, is an attractive term, and yet it means only corporate assets in excess of capital stock. It is not property separate and apart from other corporate assets, and the representation that the $10 payment will be represented in capi-

tal and surplus is a representation that the $10 realized from the stock belongs to the company, whether called by the name of "capital" or "surplus."

It is contended that the statement in some of the subscription blanks, to the effect that it is clearly understood that the fiscal agent shall deliver to the company only the amount collected on capital stock, and that the first half of the subscription shall be construed as surplus, so explains the matter to the stockholder as to repel the conclusion of fraud, and indeed to indicate unmistakably Pandolfo's good faith in this respect. It is true that in some places these statements do appear, intermingled with the others as to "unimpaired capital" and "surplus" going to the company, and thus there was raised a question of fact for the jury whether indeed these statements were not intended merely as a haven in case of storm, a help in trouble, or whether on the whole it was not the deliberate plan and purpose that intending purchasers of stock should be deceived into the belief that the entire consideration would go to the company.

When it is considered that at this time the corporation was not organized, its plant not located, no new car had been designed, and not one definite step taken towards building a single car, and that the first sample car was not ordered until in the following April, it would scarcely be possible to conclude that in the mind of Pandolfo there was at the time these representations were made the remotest idea that 100 of the cars could be on exhibition within about two months thereafter, or 30,000 manufactured within the year. And when about the same time he represented to the public that the stock was worth more than it was selling for, and should earn a reasonable dividend on ten times the selling price the first year, and that the company's tangible assets will be greater than the par value of its stock "right off the bat when the stock is sold," it cannot be said that the jury was unwarranted in concluding that he knew such predictions and promises could not under most favorable conditions be realized, as indeed they were not.

When in 1917 as a war measure the government restricted automobile manufacture Pandolfo undertook to design and manufacture a tractor, to which some reference had theretofore been made. Straightway, and without a tractor having been built or even definitely designed, he began to exploit it in the same fulsome way as he had the automobile, ascribing to it superlative virtues, and quite fantastic stock dividend paying qualities. Persons were employed to design a tractor, and one was in fact constructed at great cost. This was subsequent to the mailing of the letters as charged in counts 1, 2, 3, and 5, and proper to be shown as bearing upon the question of Pandolfo's good faith in the entire matter, but need not here be further considered. Sufficient has been pointed out to require the conclusion that, regardless of Pandolfo's protestation of good faith, and of certain facts and circumstances which would tend to corroborate it, there appears sufficient incriminating evidence to sustain these counts.

[3] Respecting proposition 3 as to fatal variance between the scheme charged in these counts and the evidence for the government,

what has already been said will dispose of this contention. Substantially all of the incriminating evidence referred to, respecting the scheme or artifice to defraud, is referable to the scheme charged in these counts. As to proposition 4 there are some features more or less serious. In 1918 it was suggested that a moving picture of the St. Cloud plant in operation might be a useful item of evidence, as well as an advertising medium, and a photographer was employed, who made film pictures thereof. The photographer testified that the film reproduced conditions there as he found them. On the trial defendant offered to exhibit this film to the jury. The court indicated that, if photographs were admissible, he did not know why films would not be; but when later it developed that one Forsyth, who was the company's advertising manager and was at the head of an advertising corporation which Pandolfo had organized to conduct the company's advertising, was present at the making of the film, the court concluded that the film was not accurate, and declined to admit it in evidence.

[4] Under the circumstances disclosed, we cannot say that there was error in this ruling. The evidence for defendants consisted very largely in the description of the company's plant, and of the work it was doing. It was in evidence without contradiction that large, substantial, and very costly buildings had been erected at St. Cloud, and they were described with minuteness. The machinery and the appliances were also fully described, and the cost of all stated. Photographs, 75 or more, were received in evidence, showing in detail different parts of the plant and the equipment, and employees in the act of operating machines. The moving picture would not amplify this, beyond showing the movement of machinery and action of employees, at the particular time of the making of the film. The fact of operation, and manner thereof were not at all in dispute, and the question of permitting the moving picture to be displayed before the jury was so far within the discretion of the court, that, while it might not have been error to have received it, it was not error to exclude it.

[5] But a more serious question is not in the exclusion of the offer to show the picture, but in the comments of the court in excluding it. After having suggested it was admissible, it developed that Forsyth was present during all the time the photographer was taking it; and thereupon the court in excluding it said:

"I will on my own motion and on the showing that Forsyth directed this work, Forsyth the advertising manager, I will rule them out. I will take judicial knowledge of the fact that an advertising manager's prime purpose is not to reproduce a thing exactly as it normally is. That may be a vile thing for a court to know about professionally of advertisers, but I am not going to denude myself of ABC's of knowledge that I have and everybody has outside."

It is contended for plaintiff in error that since considerable of the advertising matter in evidence was written by Forsyth this statement of the court in the presence of the jury practically told them that the advertising matter was false; and as the question of the truth or falsity of the advertising was important in the case, this state-

ment invaded the province of the jury and was highly prejudicial. It would doubtless have been better had the remark not been made. Witnesses had testified, and Pandolfo conceded, that in the earlier stages in some of the advertising matter there was "exaggeration." The word "exaggeration" must not be permitted to conceal the real fact. If the jury believed the "exaggeration" amounted to a materially false representation, made pursuant to a scheme to defraud, followed by the mailing of letters to carry out the scheme, all as charged in the indictment, it would warrant conviction. The conceded "exaggeration," supplemented as it is by evidence such as above referred to, does not leave room for the conclusion of any very serious harm resulting from the remark of the court, which was not directed at Forsyth alone, but was a general statement, applicable to all advertising managers.

[6] Proposition 5, respecting statements of stock salesmen to customers in the course of stock-selling transactions, is not seriously impressive. When one sets in motion an instrumentality for evil, he may not complain if it operates in substantial compliance with its purpose. Pandolfo's vigorous personality was evidently the inspiration of this remarkable stock-selling campaign. It is not within reason to suppose that he would definitely and in terms instruct his army of agents to misrepresent for the purpose of selling stock. The representations testified to do not widely differ from the extravagant statements in the advertising literature prepared or approved and widely circulated by Pandolfo, who kept lashing his agents as a jockey might his mount, to yet further and stronger efforts, and to impart to them some of his own push and hustle. A few examples may with profit be referred to. September 25, 1917, he sent out this note:

"To the Boys on the Firing Line: Inclosed you will find copy of a letter that is going to 9,220 subscribers. All classes of people in the United States were never so prosperous as they are now. If you do not get the money, it is your own fault. Now is the time for you to put on the steam! Enthuse up, and go absolutely hog-wild and rabbit-crazy selling Pan Motor stock. All the boys who are conducting themselves properly and who are hitting the ball in earnest from 6 o'clock Monday morning until 10 o'clock Friday night of each week are making big money and are very happy. If you present Pan Motor stock in the right way, you should sell some stock to at least nine people out of every ten you get down to a talk. Make hay while the sun shines. We are using and will be using considerable money on our big building project within the next two or three months. We want every salesman to do his level best, and go to his very limit in making sales and getting the money. The dear people need this stock, because it is the proper thing for them to buy—we need the money, and you need the commission; so get busy.
"S. C. Pandolfo, Fiscal Agent."

October 5, an agent's prize contest was inaugurated, the details of which were set forth in a letter to the agents. They were reminded that the country was universally prosperous.

"It is up to you to hit the trail and get your share of the money. Now is the time for you to get yourself on your feet financially. * * * Preach Pan Motor stock and its wonderful possibilities enthusiastically to every one you meet and talk to. * * * I am for you; now be for yourself! The Pan Motor Company wants to be for you until the last trench is taken and the last fortification captured. It is up to you. Go to it like an Irish bull dog."

286 F.—2

And on December 15 a letter was addressed to the agents, very much in the same strain as the others, in which it was further said:

"I also believe that those who buy Pan Motor stock are on the main highway to greater future financial success and the enjoyment of a better social standing, because I sincerely believe that only a few dollars invested *now* in Pan Motor stock will not only earn a substantial dividend every year from now on, but, in addition to that, will be worth in the course of a few years, several thousand per cent. more than the amount they invested in this stock. * * * Please bear in mind that the company needs the money to carry out, successfully, all of its great plans; you need the commission in order to satisfy your ambition; and the dear people need this stock in order that their hopes and future ambitions may be realized. The logical conclusion is: Go Sell This Stock! Ginger up—enthuse up—steam up—And Go Some! Go Get this money to the tune of Merry Christmas Bells!
"S. C. Pandolfo, President."

Agents were authorized to accept Liberty bonds at par for stock. Under the circumstances, no fine line can be run between what was and what was not authorized to be represented by the agents. Freeman v. United States, 244 Fed. 1, 156 C. C. A. 429; Whitehead v. United States, 245 Fed. 385, 157 C. C. A. 547.

[7] Proposition 7, asserting error in the court's investigation of the affairs of the two named journals, is untenable. It seems these papers voluntarily published highly laudatory articles concerning the company and Pandolfo, in the hope, no doubt, that a large number of copies would be purchased for distribution, and that thereby remuneration would come. Many copies were purchased, and the articles were copied and circulated in the interest of stock-selling. This made proper the searching inquiry into the business methods of these papers with high-sounding names, and we find nothing improper in the examinations, much of which was out of the presence of the jury.

The eighth proposition avers entire want of evidence to show mailing of the indictment letters of counts 1 and 5. Perusal of the evidence thereon satisfies us that the jury was warranted in finding that these letters were deposited in and passed through the post office as alleged.

Proposition 9 is more serious. The capital issues committee was created by the federal government as a war-time measure, to prevent indiscriminate or unnecessary sale of corporate stocks and securities during the war. Application for license to sell to the public a large block of this stock was made to the committee, which thereupon conducted an investigation of the company's affairs, and ultimately denied the license, making to Congress a report which rather sharply criticized the Pan Company and its stock-selling methods. The report was offered in evidence and received over the protest of the defendants. This report was no part of the dealings or correspondence between the capital issues committee and Pandolfo, or the company, but was from the committee to Congress, and it is not seriously contended that as original evidence on behalf of the government it would have been admissible.

[8] It seems that after this report to Congress had been made, it was circulated quite freely in Colorado, and a committee of Colorado stockholders was appointed to investigate the charges of this

very report. This committee came to St. Cloud, where it remained a number of days examining the affairs of the company, and while there prepared a report which was highly laudatory of the company and Pandolfo. This Colorado report had been referred to by defendants' witnesses, including Pandolfo, in his direct examination, and was offered and received in evidence on his behalf as bearing on the question of his good faith. The report begins:

"In view of the various charges of a most serious nature involving the integrity, honesty and reliability of the Pan Motor Company originating with the report of the Capital Issues Committee to Congress," etc.

The report contains some other references to the capital issues report, and the statement that influence against the company is being exerted on behalf of competitors upon newspapers, magazines, *government* and state officials. On behalf of the defendants there was also offered about the same time the laudatory George Levy report, which referred to the "unpleasant publicity given to this company by various public bodies, including * * * the statement made before Congress by the capital issues committee." In view of the fact that these items of evidence, particularly the Colorado committee report, were induced by and predicated upon and referred to the capital issues report, it was not improper to receive in evidence the latter as a part of Pandolfo's cross-examination.

[9] But even if there was impropriety in this, it can hardly be said that, under the circumstances, serious injury to the defendants resulted from its admission. Pandolfo was, of course, most anxious to have the benefit of the very flattering and exculpating report of the Colorado committee. But even this report was tempered by the reference therein to the "charges of a most serious nature" of this capital issues report. This reference to a report of a committee exercising a function of the government could have been scarcely less harmful than the report itself. In the absence of the report itself, the jury would have been left to their own conjecture as to the seriousness of the charges in it, and very likely with greater detriment to defendants than came from the report itself. Harrison v. United States, 200 Fed. 662, 119 C. C. A. 78, much relied on to sustain this proposition, is not in point. The statement in that opinion that the letter was not *primarily* admissible for the government, is significant. Nor did it there appear that the defendant himself had in effect first introduced the same subject-matter.

[10] Proposition 10 involves this feature: Pursuant to an order on the district attorney, defendants were supplied with a list of the government's witnesses but cautioned not to communicate with them. Pandolfo nevertheless sent a letter to the witnesses who were stockholders, saying in effect that he had letters and affidavits from stockholders to the effect that post office inspectors had maliciously misstated facts regarding the company and its officers; that all he wanted was a fair trial, and that the facts were entirely different from those represented by the inspectors; that he wished all would go through the plant to know the truth, and requesting that an affidavit

be sent him stating what post office inspectors had said to the person addressed. Upon this letter being received in evidence for the government defendants offered the affidavits said to have been referred to in the letter as the basis for sending it. These affidavits were excluded. The letter was offered no doubt on the theory that it tended to show an attempt on the part of Pandolfo to influence the government's witnesses. As such it in no manner depended on the verity of the assertion therein that Pandolfo had affidavits. The affidavits of themselves were clearly hearsay, and their exclusion was not improper. It appears that many, if not most, of the inspectors referred to, were witnesses for the government, and their activities among stockholders might have been inquired into as part of their cross-examination, and, if then improper methods were denied, it might have been shown by those who knew the facts, but in no event by affidavits.

[11] Proposition 11 refers to the admission of correspondence between the company or Pandolfo and blue sky commissions of various states. The general purpose of such commissions is well known. Before corporate stock may be offered for sale, there must be approval and license by such commissions in the states that have them. The commissions are official bodies, and where, as here, application to them is made, and they are authorized to make examination, the dealing directly between the commission and the applicant for permission to sell the stock is proper to be shown. The purpose in offering these matters was to show that there was withheld from the commissions certain resolutions of the company respecting Pandolfo's share of the stock sales, far more favorable to him than would seem from certain apparent modifications of the previous 50 per cent. agreement. We believe this was proper to be shown, leaving the force of it for argument, and its lawful scope to such direction as the court might give by way of charge to the jury.

Concededly the court's charge was correct. No error is assigned on it, and indeed the transcript does not present the charge.

No substantial error appearing, the judgment of the District Court is affirmed.

### On Petition for Rehearing.

PER CURIAM. A thorough consideration of the questions presented anew, as well as those reargued on the petition for rehearing, has not resulted in any change in our conclusions respecting the trial of this case.

The statement appearing in the original opinion respecting the opportunity of plaintiff in error to cross-examine certain inspectors when they appeared as witnesses for the government is inaccurate and incorrect, and we avail ourselves of this opportunity of correcting it. While these inspectors were apparently present in the courtroom, none of them were called as witnesses for the government. The statement, however, was quite unnecessary to the determination of the assignment of error. It only afforded added support for the

trial court's holding. The affidavits were properly excluded for the reasons assigned, other than the one wherein the inaccurate statement appeared.

The petition for rehearing is denied.