**CORLISS v. UNITED STATES (two cases).**

(Circuit Court of Appeals, Eighth Circuit.
July 27, 1925.)

Nos. 6524, 6525.

**1. Corporations ⬪152 — Generally corporations can pay dividends only out of fund remaining after paying taxes, expenses, and fixed charges.**

Generally corporations have no right to pay dividends out of any fund except excess remaining from conduct of business after paying taxes, operating expenses, and fixed charges.

**2. Post office ⬪35—False representations in scheme to defraud must have been knowingly false or made with reckless disregard as to truth or falsity.**

In prosecution for using mails to promote frauds, false pretenses to come within Penal Code, § 215 (Comp. St. § 10385), must have been knowingly false, or made with reckless disregard as to whether they were false or true.

**3. Post office ⬪35—Business failure induced by conditions following World War held not to convert enterprise into scheme to defraud.**

Where defendants as practical creamery operators were unskilled in corporate management or law binding on corporate officers, and may well have entertained in good faith opinion that they might properly pay dividends from fund arising from sale of stock at premium, business failure of their corporation, induced by conditions following World War, did not convert their enterprise into scheme to defraud within Penal Code, § 215 (Comp. St. § 10385).

**4. Post office ⬪35—Violation of statute made out by proof of sale of corporate stock by false pretenses.**

A violation of Penal Code, § 215, as amended in 1889 (Comp. St. § 10385), can be made out by proof that money was obtained in sale of corporate stock by false pretenses.

**5. Post office ⬪49—Evidence held to remove from defendants and their agents taint of deliberate intention to make false and fraudulent representations.**

In prosecution under Penal Code, § 215 (Comp. St. § 10385), for using mails to promote frauds in sale of corporation stock, evidence that defendants' purpose was only to raise funds to enlarge their creamery business, that they did not personally profit by sale, and prior practice of corporation in reselling stock for dissatisfied owners thereof, *held* to remove from defendants and their agents taint of deliberate intention to make false and fraudulent representations.

**6. Criminal law ⬪400(3)—Admission in evidence of copies of income tax reports held reversible error.**

In prosecution under Penal Code, § 215 (Comp. St. § 10385), for using mails to promote fraud in sale of corporate stock, where most important evidence of government was six exhibits purporting to be copies of income tax reports, which showed corporation was conducted at annual loss, and originals under Act

Feb. 24, 1919, § 257 (Comp. St. Ann. Supp. 1919, § 6336⅛x), and Regulations of Treasury Department, art. 1090, were available whenever needed in court, admission of copies over defendants' objection was reversible error.

**7. Criminal law ⬪698(1)—Errors in admission of evidence not waived by failure to except to overruling of objection thereto.**

Error in admission of copies of income tax reports was not waived because defendants did not take exception to court's action in overruling objection to their admission.

**8. Criminal law ⬪843—Object of exception is to challenge attention to alleged error.**

Only object of exception is to clearly challenge attention of court to alleged error.

In Error to the District Court of the United States for the District of Nebraska; T. Blake Kennedy, Judge.

Leroy Corliss, Burt B. Corliss, and others were convicted of using the mails to promote frauds, and of conspiring to commit an offense against the United States, and defendants named separately bring error. Reversed.

T. S. Allen, of Lincoln, Neb. (H. J. Requartte, of Lincoln, Neb., on the brief), for plaintiffs in error.

James C. Kinsler, U. S. Atty., of Omaha Neb. (Andrew C. Scott and George A. Keyser, Asst. U. S. Attys., both of Omaha, Neb., and Ambrose C. Epperson, Asst. U. S. Atty., of Hastings, Neb., on the brief), for the United States.

Before KENYON and BOOTH, Circuit Judges, and AMIDON, District Judge.

AMIDON, District Judge. Defendants, Burt and Leroy Corliss, with numerous other persons, were indicted in fourteen counts for violation of section 215, and in the fifteenth count for violation of section 37 of the Penal Code (Comp. St. §§ 10385, 10201). These two defendants were convicted and sentenced to the penitentiary. They alone bring error.

The facts out of which the case arose may be summarized as follows: Leroy Corliss had been in the creamery business for over thirty years, and had conducted a business of that kind under his own management since 1902. The corporation which he first organized had a capital stock of $20,000. In 1904 the stock was increased to $50,000, in 1910 to $100,000, and in 1916 to $300,000. In 1917 the total capital stock outstanding was $164,000. The war gave a great impetus to this industry, and the capital was increased in 1917 to $1,000,000. In the fall of that

year Leroy Corliss and the treasurer of the company, with many others in the same industry, were called to Washington by the United States Food Administration for a conference. In response to the request of that department, defendants set about a great enlargement of their plant. Condensed and powdered milk was the only form in which dairy products could be made available for the armies of the allies. The capital stock of the company was increased to $3,000,000, of which $2,098,850 was sold; the last sale being made in July, 1920. With the funds thus raised, the company purchased numerous plants in Nebraska, Iowa, Minnesota, and Michigan, and greatly enlarged them. They had a local business in the city of Omaha, supplying that city with milk, and they were furnishing condensed and powdered milk throughout the United States, with an especially strong demand for their products in the states where their plants were located. In 1918 they entered into a contract with the Nestle Food Company, calling for a supply of 20,000 cases of condensed milk a month. In September, 1919, the contract was enlarged so as to call for 35,000 cases a month.

There is no room for doubt on the record that defendants' business was a legitimate business, honestly conducted. From the foundation of the company in 1902 until the spring of 1920, it had uniformly paid dividends to its stockholders, ranging from 7 to 11 per cent.

The fraudulent scheme charged in the indictment is based upon the sale of stock in the creamery company, after the increase to $3,000,000. It is alleged that defendants formed a scheme to obtain money from the purchasers of their stock by means of false and fraudulent representations and promises. Numerous false representations are charged. The most serious of these are two: First, that the company had paid and would continue to pay dividends on its stock at the rate of 11 per cent. per annum, payable quarterly; second, that it would at any time, upon thirty days' notice, refund the purchase price of the stock to any dissatisfied stockholder. If these representations were not false and fraudulent within the meaning of the statute, the evidence was insufficient to justify submitting the case to the jury. A motion was made by defendants at the conclusion of the evidence for a directed verdict, and an exception was saved to the refusal to grant that motion.

There was abundant evidence that the sales agents who sold the stock represented to the purchasers that the company had paid dividends and would continue to do so. These statements were based upon the uniform practice of the company from 1902 to the spring of 1920. So far as they stated the past practice, they were true. So far as they related to the future, they were amply justified by the previous practice.

This charge, however, is the most serious one in the case, for there is evidence in the record contained in the testimony of an expert of the government, a Mr. Huston, that the company during the time this stock was sold was operated at a loss. There is also evidence from the same witness, based upon entries in the books of the company, that the dividends paid during the year 1918 were paid out of the funds arising from the premium for which the stock was sold.

[1] As a general rule, corporations have no right to pay dividends out of any fund except the excess remaining from the conduct of the business after paying taxes, operating expenses, and fixed charges. Mobile, etc., R. Co. v. Tennessee, 153 U. S. 486, 14 S. Ct. 968, 38 L. Ed. 793; 14 C. J. 800. This rule, however, is not universal. The supreme Court of Massachusetts has approved the payment of a dividend out of a fund created by the sale of stock at a premium. Smith v. Cotting, 231 Mass. 42, 120 N. E. 177, 181. The Court of Appeals of New York says: "When the property of a corporation has accumulated in excess of its chartered capital, the excess may be regarded and dealt with as constituting a surplus of profits." Roberts v. Roberts-Wicks Co., 184 N. Y. 257, 266, 77 N. E. 13, 16 (3 L. R. A. [N. S.] 1034, 112 Am. St. Rep. 607, 6 Ann. Cas. 213).

See, also, Thompson on Corporations, § 5307, and a scholarly article by Solicitor General Mitchell, 11 Am. Bar Ass'n Journal, 377, 379, 380.

[2, 3] This is a criminal case, and the false representations, in order to come within the statute, must have been knowingly false or made with reckless disregard as to whether they were false or true. The evidence tends to show that Burt and Leroy Corliss believed their business was prosperous, and that it had a promising future. They had grown up as practical creamery operators. They were not skilled in corporate management or the law binding upon corporate officers. Inasmuch as the company was greatly enlarging its business, and had a ready market for all its products, the offi-

cers were justified in the belief that the future of the company was assured; and it may well be that they entertained in good faith the opinion that they might properly pay dividends out of the fund arising from the sale of their stock at a premium. Some allowance ought to be made for the zeal and excitement which seized upon industries like the defendants' and other war industries, to enlarge business, and to believe that such increase would yield large profits. Errors committed in the atmosphere which reigned during the years 1917 to 1920 ought to be looked upon charitably. When the war ended and the troops were brought home, a disastrous reaction fell upon the business of defendants. The most urgent market for their products stopped, and, worse than that, the government found itself with large stocks of condensed and powdered milk on hand which was dumped upon the market at ruinous prices. The record shows conclusively that the disaster which overtook defendants' business was common throughout the entire industry. A business failure induced by such causes does not convert the enterprise into a scheme to defraud.

[4] A violation of section 215, as amended in 1889, can be made out by proof that money was obtained in the sale of corporate stock by false representations. Pandolfo v. United States (C. C. A.) 286 F. 8 (7); Sparks v. United States, 241 F. 777 (6), 154 C. C. A. 479; Wilson v. United States, 190 F. 427 (2), 111 C. C. A. 231.

[5] The representations here complained of, however, were not false in fact. They were only false as the result of a legal inference, only false as the result of an implication. It was true, as the agents stated, that the company had paid dividends, and in their judgment would continue so to do. This of course fairly implied that the dividends were paid out of net profits. If defendants had been actuated by any corrupt purpose, their guilt would be plain. The evidence shows that in the sale of this stock defendants had no purpose but to raise funds to enlarge their business, and that they did not personally profit from the sale of the stock. It ought also to be borne in mind, in judging of this feature of the case, that neither of these defendants was a bookkeeper. They did not keep their books, but intrusted that to others, and the statements upon which they relied were prepared by auditors. See Bettman v. United States, 224 F. 819, 828, 829, 140 C. C. A. 265; Moore

v. United States (C. C. A.) 2 F.(2d) 839, 841, 842 and 843. It is also true that the books were audited by registered accountants, wholly independent of the company, and the reports which these accountants made were such as to convince the defendants that their business was prosperous and payment of dividends justified. All of this also receives powerful support from the report of the master recommending a dismissal of the petition in involuntary bankruptcy against the company, which report was approved by the District Judge and the petition dismissed. The assets of the company were also appraised and valued by the American Appraisal Company, by the firm of Lloyd & Thomas, and by the Omaha Real Estate Board, and the reports of these disinterested and independent concerns were all favorable to the company. Facts which would lead to such a judgment from such capable and independent sources throw a powerful light upon the motives and beliefs of the defendants at the time the stock was sold and the dividends paid.

Turning now to the promise of the agents that purchasers of the stock would be able to get their money back upon notice to the company if they so desired, the evidence shows that the company had for many years sold stock for dissatisfied stockholders and turned the money over to them, making no charge for the service. A list of thirty-two names of stockholders for whom the company had performed that service was presented in evidence and not contradicted. This practice of the company, if it did not justify the statements of the agents, at least removed from them the taint of a deliberate intention to make false and fraudulent representations. Some weight ought also to be given to the fact that every person who purchases stock in a company is bound to know that the investment cannot be recalled, and that the company has no right to return the investment to the prejudice of other stockholders or of creditors of the company.

We would not impair in the least the efficiency of the law against schemes to defraud, but a careful study of the record has left in our minds the impression that the business enterprise here involved differs widely from the schemes to defraud that have fallen under the condemnation of the courts. Compare Mandelbaum v. Goodyear Co. (8th Circuit; filed May 30, 1925) 6 F.(2d) 818, an action for deceit requiring less cogent proof than a criminal case.

[6] The most important evidence in sup-

port of the government's case consists of six exhibits purporting to be copies of income tax reports made by the company to the government. Three of these were identified by a former bookkeeper. The other three were wholly unidentified. These documents were received in evidence over properly framed objections by defendants. The papers were presented by the prosecution for the purpose of showing that defendants had made sworn statements to the government which demonstrated that the company's business was not prosperous but was conducted at an annual loss. The instruments on their face showed that they were copies. Before they could be received in evidence, the fundamental rule required the government to show that the original documents could not be produced. Greenleaf (15th Ed.) §§ 82, 84; Stephens, arts. 64, 65. The very nature of the papers proved that such a showing could not have been made. The originals were in the custody of the government, and, under the statute of Congress, were available whenever needed in court. Act Feb. 24, 1919 (40 Stats. at Large, 1086, § 257 [Comp. St. Ann. Supp. 1919, § 6336⅛x]), and Regulation of Treasury Department, art. 1090. These copies are not signed. Witnesses were allowed to testify as to who signed some of the originals. A more flagrant violation of the best evidence rule could hardly be conceived. This evidence goes to the very center of the government's case. The rule requiring a document to be proved by its own production, and not by copy, and the rule which requires the production of the best evidence, both forbade the acceptance of these copies in evidence. For this error the case must be reversed.

[7, 8] The government urges that these errors are waived because counsel for defendants did not take an exception to the action of the court in overruling his objection to the evidence. He cites Feinberg v. United States (C. C. A.) 2 F.(2d) 955. That case, however, does not support his contention. There no motion was made for a directed verdict at the conclusion of the evidence. And yet counsel for the defendant insisted that under section 269 of the Judicial Code, as amended by Act Feb. 26, 1919 (Comp. St. Ann. Supp. 1919, § 1246), it was the duty of the court to examine the record and reverse the case because, as he contended, the evidence was insufficient. There was no motion and consequently no objection to any ruling. It is plain that the question whether an exception is necessary was not before the court. None of the cases cited by counsel raises the specific question for which he contends; namely, whether, when a proper objection is made to evidence and the court overrules the objection, it is necessary for counsel to claim an exception if he wishes to assign the ruling as error. The only object of an exception is to clearly challenge the attention of the court to an alleged error. Proper objection to evidence constitutes such a challenge. For counsel to utter the word "Except" after the ruling of the court adds nothing to the challenge, and is often inconsistent with a respectful and orderly conduct of the trial. The practice goes back to a time when the claiming of an exception was a formal matter, and, if entertained by the presiding judge, he made a note in his minutes of the question raised, and then and there settled the exception. That practice is no longer consistent with the dispatch of work. Exceptions to the charge to the jury are necessary, because that is the only way in which the attention of the court can be called to the action complained of. Such, however, is not the character of rulings upon evidence. As to them, the judgment of the court is clearly invoked by the objection. Taking an exception does not add to the challenge or in any way aid the court. It is therefore idle, and failure to take it does not waive the objection.

The judgment of the trial court is reversed.