Harry S. GETCHELL, Hollis Rinehart, William F. Powers and Francis E. Getchell, Appellants,

v.

UNITED STATES of America, Appellee.

No. 17338.

United States Court of Appeals Fifth Circuit.

Sept. 2, 1960.

Cody Fowler, Walter Humkey, Harvie S. DuVal, Emmett W. Kehoe, Miami, Fla., Paul Kickliter, Herbert S. Phillips, Tampa, Fla., Chester Bedell, Jacksonville, Fla., for appellants.

James L. Guilmartin, U. S. Atty., Miami, Fla., for appellee.

Before RIVES, Chief Judge, and TUTTLE and BROWN, Circuit Judges.

RIVES, Chief Judge.

This appeal is from judgments of conviction for violation of the mail fraud statute,[1] or of Section 17(a) (1) of the Securities Act of 1933[2] [15 U.S.C.A. § 77q(a) (1)], or of both. Of the twelve-count indictment, five counts must be considered. Each of the four defendants was found guilty on Count Six. Hollis Rinehart and Harry S. Getchell were found guilty also on Count Eight. Francis E. Getchell was found guilty on both of said Counts and also on Counts One, Five and Nine.[3]

The prosecutions grew out of the financial collapse of a business enterprise embracing both Florida Palms, Inc., and a proposed corporation to be called Florida Alpha Pulp Corporation. Francis E. Getchell was the principal figure in the enterprise—President and director of Florida Palms, Inc., and promoter and organizer of both corporations. The enterprise was, practically speaking, "his" enterprise. Harry S. Getchell was the son of Francis E. Getchell and was named Vice President and a director of Florida Palms, Inc. He served as an aide to his father in promotional and organizational activities, and was the inventor, real or purported, of the process which the enterprise was designed to exploit. Hollis Rinehart was the personal attorney to Francis E. Getchell and was attorney for both corporations. In addition, he was named as Secretary and a director of Florida Palms, Inc., and for a certain time was named also as Treasurer of that corporation. William F. Powers was a certified public accountant who kept the books and accounts of Florida Palms, Inc. He was to become Treasurer, Comptroller, and a director of Florida Alpha Pulp Corporation upon its formation.

The alleged device, scheme, or artifice to defraud was described in Count One of the indictment and adopted by reference in each of the other Counts. False representations were allegedly made by the defendants to prospective purchasers of the stock of Florida Palms, Inc. and the pre-organization certificates for stock in the proposed Florida Alpha Pulp Corporation that the Getchells had developed

---

1. "§ 1341. *Frauds and swindles*

"Whoever, having devised or intending to devise any scheme or artifice to defraud, or for obtaining money or property by means of false or fraudulent pretenses, representations, or promises, or to sell, dispose of, loan, exchange, alter, give away, distribute, supply, or furnish or procure for unlawful use any counterfeit or spurious coin, obligation, security, or other article, or anything represented to be or intimated or held out to be such counterfeit or spurious article, for the purpose of executing such scheme or artifice or attempting so to do, places in any post office or authorized depository for mail matter, any matter or thing whatever to be sent or delivered by the Post Office Department, or takes or receives therefrom, any such matter or thing, or knowingly causes to be delivered by mail according to the direction thereon, or at the place at which it is directed to be delivered by the person to whom it is ad-

dressed, any such matter or thing, shall be fined not more than $1,000 or imprisoned not more than five years, or both." Title 18 United States Code, § 1341.

2. "§ 77q. *Fraudulent interstate transactions*

"(a) It shall be unlawful for any person in the sale of any securities by the use of any means or instruments of transportation or communication in interstate commerce or by the use of the mails, directly or indirectly—

"(1) to employ any device, scheme, or artifice to defraud * * * *."
Title 15 U.S.C.A. § 77q(a) (1).

3. Though not so indicated by the district court, the sentences to imprisonment of the several defendants actually correspond to the number of counts on which each was found guilty; that is, Powers, one year, Rinehart, two years, Harry S. Getchell, two years, and Francis E. Getchell, five years.

a process for producing alpha-cellulose pulp from Sabal or cabbage palm trees, which are found in abundance in the Okeechobee, Florida area. The indictment charged that the defendants made a number of additional misrepresentations to prospective investors.

Counts Six and Eight charged the defendants with violations of Section 17 (a) (1) of the Securities Act of 1933. Counts One, Five and Nine charged them with violations of the mail fraud statute. A particular use of the mails was alleged in each Count as essential to constitute the federal offense charged.

Count Six, on which each of the defendants was found guilty, charged that the defendants on or about the 26th day of March, 1955, knowingly caused to be delivered by mail a preorganization subscription for the purchase of stock of the proposed Florida Alpha Pulp Corporation addressed to C. William Curtis, 344 Ribault Avenue, Daytona Beach, Florida.

In the examination of Curtis as a witness for the Government, the mimeographed preorganization subscription for the purchase of stock referred to in Count Six was identified as Government Exhibit 75. The only proof of its mailing was the testimony of Curtis that he received it "through the mail to my home address." The exhibit purports to be signed by F. E. Getchell as Trustee and by F. E. Getchell on behalf of Florida Palms, Inc. The district court admitted Exhibit 75 in evidence against F. E. Getchell, but at the time of its introduction directed that it "is not to be considered at this time against the other defendants." There was no evidence that any of the other defendants knowingly caused this exhibit to be mailed. The exhibit was never introduced in evidence against any of the defendants other than Francis E. Getchell. As to Count Six, therefore, it is clear that the district court erred in refusing to direct an acquittal of the defendants Powers, Rinehart and Harry S. Getchell.

Rinehart, Harry S. Getchell and Francis E. Getchell were convicted also on Count Eight. That Count charged that the defendants on or about the 24th day of February, 1955, knowingly caused to be delivered by mail a certain letter addressed to Edward S. Fox, 318 Vermont Avenue, Daytona Beach, Florida. A copy of this letter to Fox is as follows:

"Rinehart & Gibbs
"Counsellors at Law
"Ingraham Building
"Miami 32, Florida

"Cable Address
"RINCAR

"Hollis Rinehart
"William W. Gibbs

"February 24, 1955
"Edward S. Fox
"318 Vermonth (sic) Avenue
"Daytona Beach, Florida
"Re: Florida Alpha Pulp Corp.
"Dear Mr. Fox:

"As you may know, Mr. Getchell is about ready to complete the incorporation of the above company. As Secretary, I am writing all subscribers to confirm their subscription, and specifically for the purpose of learning just how they wish their certificates issued.

"Please give me the above information promptly.

"Very truly yours,
"(s) Hollis Rinehart"

There was no proof that either or both of the Getchells knowingly caused Rinehart to mail this letter. Apparently the letter was Rinehart's own idea. Before receiving the letter, its addressee Fox had fully paid for his subscriptions, and had actually sold five hundred of the four thousand shares subscribed for by him for $4,000.00, the subscription price for the entire four thousand shares.

Count Eight charges a violation of 15 U.S.C.A. § 77q(a) (1), quoted in footnote 2, supra, and which, for convenience, is again quoted:

"§ 77q. *Fraudulent interstate transactions*

"(a) It shall be unlawful for any person in the sale of any securities by the use of any means or instruments of transportation or com-

munication in interstate commerce or by the use of the mails, directly or indirectly—

"(1) to employ any device, scheme, artifice to defraud, or * * * *."

That provision is somewhat ambiguous as to the type of mailing (when, as in this case, the use of the mails is charged) that will violate the statute; that is, whether the mails must be used (1) simply in effecting the sale, or (2) in the employment of the device, scheme, or artifice to defraud. The criminal provisions of the Securities Act are certainly as broad as those of the mail fraud statute.[4] They may be broader, depending on whether fraud or the use of the mails is considered to be the gist of the offense under the Securities Act. Professor Loss notes his view that the cases which hold that fraud is the gist of the offense seem better considered, but that "* * * there is some authority that under Section 17(a) of the Securities Act * * * the use of the mails is the 'gist' of the offense—the *corpus delicti* —as it is under the mail fraud statute." Loss Securities Regulation, p. 877. He further cites a Commission case,[5] as expressing the view that there is nothing in the language of the mail fraud statute or the Securities Act "which would justify the requirement that the fraud or device must be more intimately related to the use of the mails * * * under one statute than under the other."

That question of statutory construction need not be decided in this case, for Count Eight places the phrase "by the use of the mails" considerably removed from "the sale of securities," but immediately adjacent to "willfully employ said scheme, and artifice to defraud,"[6] so that the ordinary and natural meaning of the charge is that the defendants did "by the use of the mails, willfully employ said scheme and artifice to defraud."

Rinehart's letter contained no offers, promises or representations. It employed neither directly nor indirectly any device, scheme, or artifice to defraud. Compare Parr v. United States, 363 U.S. 370, 80 S.Ct. 1171, 4 L.Ed.2d 1277. It was, at most, "merely incidental and collateral to the (alleged) scheme and not a part of it." Kann v. United States, 1944, 323 U.S. 88, 95, 65 S.Ct. 148, 151, 89 L.Ed. 88. In our opinion, the district court should have directed a judgment of acquittal of each of the defendants as to Count Eight. The judgments of conviction of Powers, Rinehart and Harry S. Getchell must therefore be reversed. The judgment of conviction of Francis E. Getchell alone remains to be considered.

The enterprise in question dates back to the summer of 1953, when Francis E. Getchell arrived in the town of Okeechobee, Florida. The purpose of his visit, as disclosed soon after his arrival, was to promote and organize a corporation which would manufacture paper pulp from the cabbage palm. Such a venture was, so far as the record discloses, entirely novel, but it promised to be extremely lucrative if successful.[7] And Getchell maintained that such success was possible. His optimism in this regard apparently stemmed from his belief in a proc-

4. Price v. United States, 5 Cir., 1953, 200 F.2d 652, 655; Kopald-Quinn & Co. v. United States, 5 Cir., 1939, 101 F.2d 628, 632; United States v. Monjar, 3 Cir., 1944, 147 F.2d 916, 920; Kelling v. United States, 10 Cir., 1951, 193 F.2d 299, 301.

5. Polk-Peterson Corp., 10 S.E.C. 1132, 1136, n. 4.

6. "2. On or about the 24th day of February, 1955, in the Southern District of Florida, the said defendants, so having devised the said scheme and artifice to defraud, would and did in the sale of securities: namely, preorganization subscriptions for Class A and Class B stock of the proposed Florida Alpha Pulp Corporation, by the use of the mails, willfully employ said scheme and artifice to defraud, said use of the mails being in the manner following, to wit:"

7. The hope for high profits was quite reasonable in view of the fact that the cabbage palm would be an extremely cheap raw material. Such trees are of practically no commercial value at the present level of technology in the industry.

ess on which he had been working for many years and on which his son, Harry Getchell, or at least so Getchell contended, made significant advances.

Immediately upon his arrival, Getchell set out to get his enterprise started. His first step was the execution of a number of contracts with the ranchers living in the area whereby he obtained the right to cut and remove cabbage palm trees from their land. With the help of Jackson C. Coker, a director of the local Chamber of Commerce, whose acquaintance he made shortly after his arrival, Getchell eventually obtained cutting rights to some 449,000 acres of land from seventeen different persons.

At this point, Getchell, with the assistance of his attorney Hollis Rinehart, organized a corporation known as Florida Palms, Inc. The aforementioned cutting contracts or leases were placed in the name of this new corporation, all of the stock of which was issued to members of the Getchell family: to Getchell himself; to his son, Harry Getchell; and to the elder Getchell's wife and daughter, neither of whom is involved in this case.

Under Getchell's plan, these were but preliminary steps in the promotion and organization of the second corporation, Florida Alpha Pulp Corporation, which was to be the primary figure in the enterprise. The next step was initiated by the Chamber of Commerce of Okeechobee. That body purchased a forty-acre tract of land and deeded it to Florida Palms, Inc., on the understanding that the land was to be used as a plant site for the proposed Florida Alpha Pulp Corporation. Florida Palms, Inc., thereupon purchased an additional twenty-five acres adjoining this tract in order to assure the proposed corporation an adequate plant site.

Thus, when the stock of the Florida Alpha Pulp Corporation was placed for subscription, there were two main possible obstacles to the success of the venture: first, the need for capital to build the plant; and, second, the possible failure of the unproved process. The necessary raw materials had been assured, a plant site had been secured, and labor was amply available.

Subscriptions for the stock of Florida Alpha Pulp were not solicited on the open market. Rather, the subscribers were a small group of investors in the area, who became familiar with and interested in the enterprise, and those friends with whom they communicated.[8] In order to facilitate subscriptions to the stock, Getchell, with the aid of his accountant William Powers, prepared a brochure setting forth the current status of the enterprise and estimating its future earnings. This brochure was the primary stimulus for the initial investors in the enterprise. Subsequently, new investors and re-investors were appealed to by direct communications from Getchell, demonstrations at a pilot plant, communications from other investors, and communications from independent members of the pulp industry.[9]

At the organizational meeting of the Florida Alpha Pulp Corporation in April 1955, a majority of the investors became disenchanted with Getchell and his enterprise. When an investigation revealed that some $140,000 of the investors' funds had been spent for which nothing substantial could be shown, Getchell was ousted from control of the enterprise. A civil action was then brought against Francis E. Getchell and Florida Palms, Inc., and by stipulation a decree was entered in favor of the complaining investors for $143,500.99. According to the Government's brief, the parties-plaintiff to that suit eventually recovered approximately 20% of their investments. Fi-

---

8.  Getchell deliberately restricted the number of investors in order to avoid the expenses connected with registration under state and federal laws.

9.  The brochure was, in fact, re-printed and re-circulated on each occasion when Getchell launched a new subscription campaign, but the record indicates that it had only minor significance in these subsequent campaigns.

nally, this criminal proceeding was instituted.

The Government has taken the position and has sought to prove that the Getchell enterprise was, from its very inception, nothing more than a scheme to defraud investors. Summarized briefly, the Government's case as to the existence of a scheme to defraud rests upon the following contentions: (1) that

Getchell knew that his process for making paper pulp from the cabbage palm was worthless and that, consequently, the enterprise would never succeed; [10] (2) that Getchell falsely represented to potential investors that the process would work and that responsible persons in the industry had so concluded after investigation of the results obtained by the process; [11] and (3) that, after deceiving

10. Both the mail fraud statute, n. 1, supra, and the Securities Act of 1933, n. 2, supra, are aimed at schemes and artifices to defraud. An over-all and comprehensive scheme and artifice is charged in Count One as having been devised prior to the 1st day of May 1953, and pursued continuously thereafter.

11. Various specific representations are alleged to have been parts of said scheme and artifice. The representations alleged to have been false and fraudulent are quoted from the indictment:

"(a) That the palm pulp process devised by Francis E. Getchell and Harry S. Getchell had been fully perfected.

"(b) That said process for producing alpha cellulose pulp had been patented.

"(c) That the proposed Florida Alpha Pulp Corporation would be in operation in October, 1954, and that the company had a sale for the entire capacity of the plant, and that investors in stock of this corporation would receive $1.00 in dividends for each $1.00 invested during the first year of operation.

"(d) That machinery and equipment for the proposed plant of Florida Alpha Pulp Corporation would cost $265,000.

"(e) That pulp produced by said process from cabbage palm trees has a chemical analysis of 88.25% of alpha cellulose, and that in its unbleached form it has a content of 96.92% alpha cellulose.

"(f) That there are sufficient cabbage palm trees in Southern Florida to provide the Florida Alpha Pulp Corporation with a supply of raw material for 100 years if another tree never grew back.

"(g) That the defendant Francis E. Getchell had expended the sum of $10,000 in securing timber leases to provide palm trees for the proposed plant.

"(h) That the defendant Francis E. Getchell had spent several hundred thousand dollars in developing said process for manufacturing pulp from cabbage palms.

"(i) That the Industrial Engineering Corporation of Tampa, Florida, had been

built up under the direction of the defendant Francis E. Getchell to a three-quarters of a million dollar concern.

"(j) That Blaw-Knox Company of Pittsburgh, Pennsylvania, was greatly excited about the said alpha pulp process, and that they would build a plant for Florida Alpha Pulp Corporation and arrange for its financing by the Mellon National Bank of Pittsburgh.

"(k) That the St. Regis Paper Company was highly interested in buying the mill output of Florida Alpha Pulp Corporation, and that it would take the entire production of the plant for the first two years and would like to enter into an agreement to take the output for five years, but that in order to keep their production lines going, they had to be assured of 200 tons of palm pulp daily.

"(l) That Noble & Wood Machinery Company of Hoosick Falls, New York, were so impressed with said process that they would build a plant for Florida Alpha Pulp Corporation and would arrange for its financing, which said corporation could pay off as it produced pulp.

"(m) That Noble & Wood Machinery Company was engaged in making machinery for the proposed plant of Florida Alpha Pulp Corporation.

"(n) That Burlington Mills of Greensboro, North Carolina, was a substantial user of acetate, a by-product of said process and was anxious to buy it from the Florida Alpha Pulp Corporation.

"(o) That Sandy Hills Brass and Iron Company of Hudson Falls, New York, thought so highly of the Florida Alpha Pulp Corporation's project that they wanted to engineer and finance the plant.

"(p) That Paper Products Company of Swarthmore, Pennsylvania, had offered to take the entire output of the plant of the proposed corporation.

"(q) That American Viscose Corporation, Armstrong Cork Company, American Cyanimid Company, Union Carbide and Carbon Company, and the DuPont Company, were anxious to acquire said

these investors into putting money into the enterprise, Getchell wrongfully appropriated that money to his own use. Each of these contentions must be examined separately.

The origin of the Getchell process is not in doubt. Research on a process to make alpha-cellulose and paper pulp from the cabbage palm was begun by the Industrial Engineering Corporation of Tampa, Florida, at the behest of Getchell when he was directing the affairs of that corporation. When Getchell was ousted from that position, he agreed to take the process in lieu of all claims he had against that corporation which consisted of capital stock and salary due. The amount of these claims does not appear in the record.

During the interim between his acquisition of the process and his subsequent promotion of Florida Alpha Pulp Corporation, Getchell has maintained that his son made improvements in the process. There is nothing to confirm that this was true or that Getchell thought it was true. On the other hand, there is nothing to show that Getchell had, or even should have, become disenchanted with his acquisition. The inference from the testimony would seem to be strong that Getchell was enthusiastic about the process, at least until he began the promotion of Florida Alpha Pulp Corporation.

This conclusion is reinforced circumstantially by Getchell's actions with respect to the process during his campaign to promote Florida Alpha Pulp Corporation. Almost from the outset, he began to contact the most important concerns in the alpha-cellulose and paper pulp industry to get their reactions as to the commercial feasibility of his process. It is unlikely that Getchell could have entertained hopes of convincing these long-established and experienced concerns that a useless process was valuable. On the contrary, there is a strong probability that he contacted these firms because he thought, rightly or wrongly, that his process was valuable.

Moreover, the response from these firms was not such as to immediately discourage Getchell. The Government admits that a salesman of the Noble & Wood Machinery Company stated in Getchell's presence that his company thought so highly of the process that it would engineer and arrange for the financing of a plant for the Getchell enterprise. The Government goes on to point out that such a statement had not been authorized by Noble & Wood, but nowhere does it prove that Getchell knew this. The response of the other concerns was not so enthusiastic, but neither was it entirely discouraging. Rather, they seemed to adopt a wait-and-see attitude which Getchell could quite reasonably have assumed was indicative of nothing more than the ordinary conservatism of large firms. In the light of all of the foregoing, the Government has not made

process and would pay millions of dollars for the use of it.

"(r) That 40,000 shares originally offered at a price of $5.00 per block and 22,000 shares of a second group of 50,000 shares priced at $10.00 per block had been fully subscribed.

"(s) That a pro forma balance sheet and profit and loss statement of Florida Alpha Pulp Corporation was true and correct.

"(t) That the defendant Francis E. Getchell had lost control of Industrial Engineering Corporation as the result of scheming on the part of unprincipled people.

"(u) That various corporations which the defendant Francis E. Getchell had controlled and dominated had resulted in failure and bankruptcy only because various people had recognized that Getchell had valuable processes and inventions, and had succeeded in wresting control from said Getchell by unscrupulous legal maneuvers and means.

"(v) That the defendant Francis E. Getchell had retired upon an annuity income of $800.00 per month."

The evidence disclosed that many of Getchell's representations, instead of being proved to be part of an over-all scheme and artifice, were isolated and made separately to different individual potential investors. For practically all of the representations there was some basis in fact, though some, indeed most, were grossly exaggerated.

a strong case to substantiate its contention that Getchell knew his process to be worthless.

■ When the Government's second contention is examined, however, the conclusion is better proved. The Government points to a long series of instances in which Getchell appears rather clearly to have misrepresented to investors the nature of the responses which he received from his inquiries among the established firms in the industry. A guarded wait-and-see response was invariably reported to investors as a most enthusiastic response. Offers to purchase the entire potential output of the Getchell enterprise were reported where the most that could have occurred was that an offer by Getchell to sell his output was not refused outright. There is thus brought into operation the principle of law so well expressed in Linn v. United States, 7 Cir., 1916, 234 F. 543, 552:

> "The insistence that Linn honestly believed this property had great possibilities, and that, if he could get hold of it and work it, large profits would speedily come to himself and to those whom he might induce to purchase shares of the stock, may be conceded. But when, in order to raise money, he devises a scheme to represent to intending stock purchasers that his company had present title, possession, control, and operation of property, and a vast offer for it, when all this, to his certain knowledge, was false, then these constitute the scheme or artifice to defraud these intending purchasers into making purchases they would not otherwise make, and is to be considered wholly apart from the faith which Linn might have, that if, in this manner, he might raise sufficient funds, he would then get hold of the property, and make vast prof-

its for these same intended investors.

> "He has been described as an enthusiast or optimist, with unbounded faith in the ultimate outcome of his prospect. While men may not be convicted for acts done in good faith, nevertheless schemes and devices to induce the making of stock investments which plainly would not otherwise be made, by the knowingly false representation of material facts and conditions, show a culpability which enthusiasm cannot justify, nor optimism excuse." [12]

The Government points to Getchell's mishandling of the investors' money to buttress its contention that these misrepresentations were criminally motivated. Upon examination, however, there appears to be little, if any, support for the Government in that aspect of the case. Most of the missing $140,000 was actually spent on the enterprise. Many of these expenditures were doubtless foolish in the light of all of the circumstances, but they were certainly not criminal. It appears that Getchell did use some $15,000 of the investors' funds to maintain himself and his family during the two years he was engaged in promoting the enterprise. This may have amounted to a violation of an agreement between Getchell and the investors that he was to receive no salary during this period. On the other hand, the withdrawals could perhaps be justified as a "refund of money advanced" in line with an agreement between Getchell and the investors permitting such refunds.

In any case, the probative weight of this evidence concerning Getchell's handling of the investors' funds certainly must be considered *de minimis* under all the circumstances.

Our observations from an examination of the record in this case have been set

12. See also, Adams v. United States ex rel. McCann, 1942, 317 U.S. 269, 283, 63 S.Ct. 236, 87 L.Ed. 268 (dissenting opinion); United States v. Oldenburg, 7 Cir., 1943, 135 F.2d 616, 617; Foshay v. United States, 8 Cir., 1933, 68 F.2d 205, 210; Butler v. United States, 10 Cir., 1931, 53 F.2d 800, 804; Moore v. United States, 7 Cir., 1924, 2 F.2d 839, 843; Pandolfo v. United States, 7 Cir., 1922, 286 F. 8, 13; Sparks v. United States, 6 Cir., 1917, 241 F. 777, 782.

forth not to prove that the only reasonable conclusion open to the jury was that Getchell was simply an incurable optimist with a tendency to exaggerate, or even to prevaricate; or that the jury could not reasonably find or infer beyond a reasonable doubt that the alleged scheme and artifice was infected with the fraud necessary to constitute the crimes charged.[13] Rather, we point out that this case is a far cry from one "reeking with guilt."

Francis E. Getchell leaves his all too strenuous efforts to make paper from the cabbage palm [14] possessed of no more of this world's goods than when he entered. Stripped of his assets by the sheriff's sale to enforce against him the consent judgment in favor of the complaining investors, Getchell prosecutes this appeal in forma pauperis.

This is the kind of case in which we think that a court of justice should be alert to prevent a possible miscarriage of justice. In the present instance, especial alertness is not required for the record clearly shows the prosecution to be infected with prejudice, springing mostly from the extreme disappointment of disgruntled losing investors.

The description of the alleged "scheme and artifice to defraud" covered twelve pages of the typed record. Into it were drawn Getchell's son; his certified public accountant, who kept the books and whose chief fault was that he authored too rosy a "pro forma" statement or estimate of anticipated profits; and his personal attorney, a lawyer whose theretofore impeccable reputation was attested by an ex-Governor of Florida and by a State Circuit Judge, and further by the fact that he had risen to become a member of the State Board of Control which administers the affairs of the universities of the State.[15] The long indictment was recognized by the district judge as being prejudicial to the defendants, and was not sent out with the jury when the case was submitted for their deliberations. Instead, the judge prepared and sent to the jury his "brief outline of each count," advising them to use this outline "since you will not have a copy of the indictment itself during your deliberations." After the jury had remained out for more than eight hours, they sent a message to the judge that they wanted the indictment. Upon the jury's being returned to the courtroom, their foreman requested "the area which supported each of those six counts * * * the detail of the support of the six counts, or the description of the factors in arriving at those six counts." Over the strenuous objections of the defendants, the district judge then allowed the jury to take with them a copy of the six counts upon which the case was submitted. We do not hold that this was error, but we agree with the original view of the district court that the long recital of the prosecution's theory of fraud con-

---

13. As to the functions and duties of the district court on motion for judgment of acquittal and of this Court on review, see Riggs v. United States, 5 Cir., 1960, 280 F.2d 949.

14. Efforts which might possibly have been successful, as appears from the following colloquy:

"The Court: Basically, gentlemen, is there any dispute that you can't make paper out of this thing?

"Mr. Duval: They have stated in their indictment that they can't do anything.

"Mr. Guilmartin: Counsel, you should read that part of the indictment.

"Mr. Duval: I did.

"Mr. Guilmartin: We not only didn't say that, but we proved ourselves you can make paper out of it."

15. Practically all of the proof against this attorney can be explained by assuming that he had firm confidence and belief in the integrity of his client. He stated in his letter to Dr. Bruce Cominole, one of the complaining investors:

"I may add that in all the above ventures—failing as they did—Mr. Getchell was clearly honest and 'sold' so that he invested his own monies and, on most occasions, deferred all salary to himself. There is absolutely no indication that he personally profitted (sic) or enriched himself as a result of his management. I have always found him honest and of high integrity. I believe I stated to you that in my opinion, his one fault was his over-enthusiasm and optimism."

tained in the indictment tended to prejudice the defendants.

Of the twenty-three original investors, six appeared as witnesses for the defense to express their continued confidence in Getchell's honesty and integrity, while ten were witnesses for the prosecution. In the testimony of those ten prosecution-investor witnesses, there appears a natural tendency to find a scapegoat for a failing enterprise and many obvious appeals to sympathy and prejudice. For example, one of the women investors became emotional and wept, necessitating a suspension of the trial until she could become composed. The lead government witness, J. William Gall, volunteered the following:

> "Mr. Gall: * * * In that same period of time I induced Mr. William Curtis of Daytona Beach a young man with two children and wife, who put a thousand dollars in this. He told me he borrowed it from his G.I. Insurance—
>
> "The Court: Never mind what he said he did.
>
> "Mr. Duval: Your Honor, I object to that.
>
> "The Court: Objection is sustained, and it is not evidence. Watch, Mr. Gall, that you do not relate conversations that you had with people not on trial here."

To make sure that the effect of this prejudicial matter had not been destroyed, Curtis himself later testified: "We didn't have the thousand dollars in savings, so I borrowed a thousand dollars on my G.I. life insurance."

The very length of the trial itself, stretching over ten weeks from February 17, 1958 to April 29, 1958 (the record comprises more than 5000 typed pages plus nearly 300 documentary exhibits), was likely to impress the jury with the importance which the Government attached to the prosecution and with the presumed gravity of the alleged scheme to defraud.

Proof by the prosecution of the civil action in which Getchell consented to a judgment against himself in favor of the complaining investors might well have impressed the jury with the idea that Getchell had confessed his guilt. The distinction between civil liability and criminal responsibility may not have been clear to the lay jury.

An able, vigorous, and zealous prosecuting attorney rang the changes on all of these prejudicial circumstances when he used such expressions as "Look at the charm and sophistication that was exercised on little Miss Mary Gates, snow job No. 1 in this crime"; " * * * the charming lip language that flowed from the mouth of this master con man, Francis Getchell"; "Did you stop and think about what emotional feelings these investors went through who had to come in here in a public courtroom and tell about how they were conned into this situation?" The words "con," "conned," "con man," "confidence game" were repeated and reiterated more than sixteen times liberally interspersed with "gimmick," "smoke screen," "sales pitch," "a marker," "a mooch," and "taken." Harry Getchell was referred to as "that junior con man," while Francis Getchell was "a senior con man" or "a master con man." Reference was made to "this brochure going out to little people." At another place in the argument the investors were referred to as "simple people, some of the lesser persons that were in it, all of them people who had to work for a living, taken"; again, "J. William Gall, a hard working fellow"; again, "those two little Scotch persons, those hard working people, Mr. Tarling and Mr. Christie."

There was no evidence indicating that Getchell's previous business failures had been infected by fraud, but the United States Attorney plainly implied as much in using those failures to further prejudice the jury:

> "Now, that is a familiar pattern by which the con man assuages the people whom he still wants to hold onto (sic), and explains, as Rinehart helped him explain, why he had failed in these other enterprises.

"Now, at Industrial Engineering they were working on pulp, but they were supposed to be doing other things, and it failed. At Gas Equipment, other things, and it failed. American Cebastolite failed financially. This man has a record of flitting from enterprise to enterprise, leaving in his wake disgruntled stockholders, making no money, but always carrying with him this counsel, Hollis Rinehart—at least, during the period of time that he has been able to operate in this Southern District of Florida.

"It is high time that we took a good look at those activities."

True, no objection was registered to those parts of the argument of the United States Attorney to which we have referred. The District Court failed to rule on the only objection made by Getchell's counsel, which was to a veiled reference to the failure of either of the Getchells to testify:

" * * * Have we had a word to contradict the representations that Harry made, in accordance with the Government witnesses? We haven't had a single word to contradict those representations that were made.

"Mr. Curtis: Let the record reflect our objection to the last remarks of counsel."

▮ Whether or not the failure to rule on that objection was error calling for reversal, or any one of the foregoing occurrences would, by itself, be plain error, the cumulative effect of all of them makes it all too probable that the jury's verdict was brought about, not by the weight of the evidence, but by the foregoing and other appeals to sympathy, prejudice and passion which the district court left unreproved. The authority of this Court to notice *sua sponte* plain errors and defects affecting substantial rights of a defendant [16] transforms the right of appeal in criminal cases into one of substance, and furnishes an additional affirmative guarantee that conviction and

imprisonment can come only after the defendant has been accorded a fair and impartial trial. We cannot affirm the judgment of conviction of Francis E. Getchell and the sentence of imprisonment imposed upon him. As to Harry S. Getchell, Hollis Rinehart, and William F. Powers, the judgments are reversed and the causes remanded with directions to enter judgments of acquittal. As to Francis E. Getchell, the judgment is reversed and the cause remanded for further proceedings not inconsistent with this opinion.

Reversed and remanded.

TUTTLE, Circuit Judge (concurring in part and dissenting in part).

I concur in that part of the opinion and judgment that reverses, with direction to acquit, William F. Powers on Count Six.

With every deference to the views of my colleagues, I must dissent from that part of the opinion and judgment of the Court that reverses, with direction to acquit, Harry S. Getchell and Hollis Rinehart, and also from that part of the opinion and judgment which reverses for further disposition the conviction of Francis E. Getchell.

First, as to the conviction of William F. Powers, I agree that the only evidence showing any use of the mails in connection with Count Six, the only one on which Powers was convicted, was admitted by the Court as against Francis E. Getchell *alone*. Thus, as the opinion of the majority points out, there was no evidence to connect Powers with this offense.

Second, as to the conviction of Rinehart and Harry S. Getchell under Count Eight, it seems to me that the majority has misapprehended the meaning of the statute. The indictment charged that the defendants, "having devised the said scheme [the scheme being the scheme to defraud, fully alleged in the mail fraud Count One of the indictment] and artifice to defraud, would and did *in the sale*

16. Rule 52(b), Federal Rules of Criminal Procedure, 18 U.S.C.

*of securities,* by the use of the mails, *wilfully employ said scheme and artifice to defraud,* said use of the mails being in the manner following, towit:" (emphasis added), then is alleged the mailing of the letter to Fox, set out in the majority opinion.

Treating of this Count, the Court says: "[This] letter contained no offers, promises, or representations. It employed neither directly nor indirectly any device, scheme, or artifice to defraud." I think it is perfectly clear that the letter need meet none of these tests to support the indictment. It was proof of one thing, and one thing only: that the defendants were engaged "in the sale of any securities * * * *by the use of the mails.*" (Emphasis added.) Proof that in *such* sale, i. e., sale by use of the mails, the defendants employed "any device, scheme or artifice to defraud" was to be found by showing the defendants' participation in the basic scheme to defraud, which the majority says was proved as to Francis E. Getchell, and which it did not reach as to Rinehart and Harry S. Getchell.

To repeat, the letter was proof, and it was essential proof, that there was a sale of the securities mentioned in the letter *by mail.* There was no proof, and it need not be any proof of the existence of the fraudulent scheme, nor need the letter be in furtherance of the scheme as would be the case under a mail fraud prosecution. This statute is turned the other way about from the mail fraud statute. It is not the use of the mails here that is made the gist of the offense. The use of the mails merely gives the Federal Government jurisdiction. It is the employment of a scheme to defraud that is the gist of the offense, the employment of such a scheme being made a crime where the sale of securities is made by mail.

Certainly the letter asking for a confirmation of a subscription to the stock and asking how the stock was to be issued, is evidence of a "sale by use of the mails." It thus becomes necessary to determine whether there was sufficient evidence to support the jury's verdict that Rinehart and Harry S. Getchell participated in the fraudulent scheme. The majority of the Court did not attempt to pass on this question. The case against these defendants, and particularly against the attorney Rinehart, is weaker than against Francis E. Getchell. I cannot find that it was insufficient to support the finding by the Jury that Harry S. Getchell knowingly participated in the scheme to defraud, particularly in light of all of the evidence which the jury could believe about Harry's efforts to conceal the secret magic formula in his "little bottle." As to Rinehart, I would not dissent from a judgment granting him a new trial along with Francis E. Getchell. I do dissent from an order directing his acquittal.

Finally, as to the case against Francis E. Getchell, with all deference I think the Court follows an entirely unprecedented course in setting aside the verdict of the jury. This is so because, while conceding, although with evident reluctance, that there was sufficient evidence to convict Getchell, the Court succeeds in making it appear that this man, who, without any possible dispute, made numerous factually false statements in obtaining money for his unsuccessful venture, was more sinned against than sinning. And this the Court does without pointing to a single error sufficient in itself to work a reversal of the jury's verdict, and, what is not made apparent by the majority opinion, on grounds that are so insubstantial or so vague that *they are not mentioned or even hinted at by counsel for Getchell in the three briefs filed in this Court on his behalf.*

I can fully sympathize with an accused who, without any previous criminal record, finds himself convicted of the crime of mail fraud late in life. It is very apparent, from the opinion of the Court, that my colleagues feel that the jury should not have convicted Getchell, but it is equally apparent, it seems to me, that they are unable to find any basis of error

693

to warrant setting aside the conviction. Truly, it seems to me, this is an extreme illustration of the truth of the saying, "hard cases make bad law."

As stated in the majority opinion, no one of the grounds of error for which this Court reverses the verdict of the jury was called to the attention of the trial court in this ten-week trial, no one of them was complained of by counsel for Getchell either in stating the grounds of his appeal or in argument in this Court. This is *not* a case in which counsel appears in this Court urging that we take notice of plain error under Rule 52(b), F.R.Cr.P. Thus, of course, the matter was not presented to the Court for consideration. Aside from such a judgment being attended with all the evils of any decision based on a point not argued by the parties, it appears to me that the standards for review of a jury verdict in criminal cases will be seriously impaired for the future if, in such circumstances, we can reject the verdict of a jury on such general grounds, some of which are not even completely stated in the opinion of the Court.[1]

A reading of this record clearly indicates that this defendant is no sensitive, enginuous dreamer or optimist. Several of his letters, notably that to one woman who complained he had defrauded her and to whom he made restitution under threat of prosecution, indicate that he was sufficiently worldly-wise and aggressive in his attitude to warrant the jury's finding that he was guilty of a wilful fraud. The record certainly does not depict a defendant in need of the extraordinary protection extended by the unusu-

ally broadened power of review here asserted on his behalf by the majority of the Court.

I would affirm the judgment of conviction as to both the Getchells.

[1] The Court criticizes the length of the indictment, but without specifying wherein the long indictment was prejudicial. The majority weighs the character evidence in favor of one defendant in light of the public offices held by his character witnesses, a matter that I think is entirely beyond the power or function of this Court to consider. The majority opinion says it was not error for the trial court to permit the jury to read the in-

dictment, but then says it tended to prejudice the defendants. The Court then makes what to me is the surprising statement, "The very length of the trial itself * * * was likely to impress the jury with the importance which the Government attached to the prosecution and with the presumed gravity of the alleged scheme to defraud." Thus grounds of reversal are hinted at without being clearly defined.